# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KARI SUNDSTROM,
ANDREA FIELDS,
LINDSEY BLACKWELL,
MATTHEW DAVISON, also known as Jessica Davison,
and VANKEMAH D. MOATON,

        Plaintiffs,

        v.                             Case No. 06-C-112

MATTHEW J. FRANK,
WARDEN JUDY P. SMITH,
THOMAS EDWARDS,
JAMES GREER,
ROMAN KAPLAN, MD,
WARDEN ROBERT HUMPHREYS,
and MANAGER SUSAN NYGREN,

        Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DR.
DANIEL C. CLAIBORN (DOC. #116), GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS IN LIMINE (DOC. #125), AND GRANTING PLAINTIFFS'
MOTION TO EXCLUDE MEDICAL OPINIONS OF EUGENE ATHERTON
REGARDING MEDICAL TREATMENT OF INMATES (DOC. #127)**

        This case is scheduled for a bench trial to commence on October 22, 2007.

Before the court are the plaintiffs' motion to exclude testimony of defendants' expert Daniel

C. Claiborn, Ph.D., defendants' motions in limine, and plaintiffs' motion to exclude medical

opinions offered by defendants' expert Eugene Atherton.[1]  These motions will be addressed

herein.  The plaintiffs, who are current or former Wisconsin prison inmates, bring this civil

rights action under 42 U.S.C. § 1983 for declaratory and injunctive relief claiming that the

defendants have violated the United States Constitution by enforcing 2005 Wisconsin Act

---

[1] The defendants' motion for partial summary judgment, filed on July 31, 2007, is also pending.  That motion will be addressed in a subsequent Order.

105, codified as Wis. Stat. § 302.386(5m), and abruptly terminating and depriving them of medical treatment for their serious health condition, Gender Identity Disorder (GID). Further, the plaintiffs assert that the defendants acted without exercising individualized medical judgment and in contrast to the treatment the defendants provide to similarly situated inmates in Wisconsin Department of Corrections (DOC) facilities. The third amended complaint (complaint) seeks an end to the defendants' actions that violate the plaintiffs' Fourteenth Amendment right to equal protection and Eighth Amendment right to be free from cruel and unusual punishment, as well as a declaration that Wis. Stat. § 302.386(5m) is unconstitutional on its face.

On January 27, 2006, the court granted plaintiffs Sundstrom and Fields' motion for preliminary injunction. Consequently, the defendants are enjoined from withdrawing any hormone therapy which was prescribed to the plaintiffs as of January 11, 2006, and must return the plaintiffs' hormonal therapy to the level in effect prior to the January 12, 2006, reduction. Later, the preliminary injunction was extended to plaintiffs Lindsey Blackwell, Matthew Davison a/k/a Jessica Davison, and Vankemah Moaton, as these plaintiffs were identified as inmates who had been diagnosed with GID or transsexualism and faced termination of hormone therapy pursuant to Wis. Stat. § 302.386(5m). The preliminary injunction remains in effect with regard to these five plaintiffs until the trial on the merits, as the parties have stipulated to consolidation of the preliminary injunction hearing and the trial on the merits.

**PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DANIEL C. CLAIBORN, PH.D.**

On July 31, 2007, plaintiffs filed their motion to exclude testimony of defendants' psychology expert Daniel C. Claiborn, Ph.D. According to the plaintiffs, Dr. Claiborn's opinions that GID is not a legitimate health condition, and that the American Psychiatric

-2-

Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) is not authoritative, do not meet Federal Rule of Evidence 702's standards for admissibility of expert testimony in the federal courts. Plaintiffs contend that Dr. Claiborn's opinions are not the product of reliable methodology or reasoning, and are not based on reliable scientific research or methods. Also, plaintiffs state that Dr. Claiborn has limited clinical experience with transgender patients, that he fails to connect in any logical way to his opinions, and that he offers no other reliable basis for those opinions.

In response, the defendants submit that the court should deny the plaintiffs' motion. The defendants contend that Dr. Claiborn's testimony is reliable and that his testimony will assist the court in understanding the evidence and determining a fact in issue.

Dr. Claiborn prepared a report that summarized his conclusions as follows:

As outlined above, I do not believe the plaintiffs' transgender situations represent a mental disorder, a medical condition, or a diagnosable disease requiring treatment. Thus, I believe, to a reasonable degree of psychological certainty, that their transgender issues do not result in serious medical needs.

The experts in the field do not view GID as a pathological entity, and my experience as a therapist, GID evaluator, and student of the literature all reinforce that the transgender situation is about choices, not medical necessity. In fact, each transgender individual decides which options to pursue and how far and how fast to go with regard to these life-changing options – based on age, physical characteristics, income, employment, personality, pain tolerance, and desired lifestyle, among other considerations. The entire field of transgender support, of which I am proud to have been a member these many years, encourages this to be so. It is all about freedom to choose, not about forced choices, social judgment stigma, shame, or approval/disapproval.

Even assuming the validity of Gender Identity Disorder as a recognized disorder, individuals who are transgendered choose a variety of strategies rather than always proceeding in the same way. Some elect hormone therapy without surgery. Some elect cosmetic surgery. Some cross-dress and cross-identify in select

-3-

circumstances only. Each individual does what he feels <u>he needs and can accept and can afford</u>, not what is "required."

(Defs.' Resp. at 1-2 [quoting Sullivan aff., ex. A: Report of Daniel C. Claiborn dated March 23, 2007].)

In reply, the plaintiffs offer that: 1) Dr. Claiborn's clinical experience is not a reliable basis for his opinions; 2) Dr. Claiborn's opinions are not reliable; 3) defendants fail to show that Dr. Claiborn's methodology is reliable; 4) Dr. Claiborn's experience undermines his opinions that GID requires no treatment but is merely about choices; and 5) Dr. Claiborn's testimony would not assist the court in understanding the evidence and determining a fact in issue.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the district judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The court functions as a "gatekeeper" in applying Rule 702 to exclude unreliable expert testimony. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 148 (1999).

To fulfill their "gatekeeping" function under Rule 702, trial courts are to employ a two-step methodology. First, the court must determine "whether the expert's testimony pertains to scientific knowledge. This task requires that the court consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or

-4-

unsupported speculation.'" *Deimer v. Cincinnati Sub-Zero Products, Inc.*, 58 F.3d 341, 344 (7th Cir. 1995) (quoting *Porter v. Whitehall Lab., Inc.*, 9 F.3d 607, 614 [7th Cir. 1993] [quoting *Daubert*, 509 U.S. at 590]). Second, the court has to "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue – the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Deimer*, 58 F.3d at 344 (quoting *Porter*, 9 F.3d at 616).

In *Daubert*, 509 U.S. at 593-94, the Court outlined four factors that may be pertinent to the district court's analysis of the first factor, or the reliability of expert testimony: 1) "whether [the expert's theory] can be (and has been) tested"; 2) "whether the theory or technique has been subjected to peer review and publication"; 3) "the known or potential rate of error"; and 4) "general acceptance" among the relevant scientific community. However, the Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome. *See Kumho*, 526 U.S. at 141 ("[T]he test of reliability is 'flexible' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case").

The *Daubert* framework is applicable to social science experts, as well as to experts in the hard sciences. *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996); *see also United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996) (requiring application of the *Daubert* standard to testimony of a social scientist tendered as an expert witness); *United States v. Lamarre*, 248 F.3d 642, 647-48 (7th Cir. 2001).

The plaintiffs contend that Dr. Claiborn's opinions regarding the DSM and GID do not meet the standards of Rule 702 and should not be admitted. Specifically, the plaintiffs assert that the court should exclude Dr. Claiborn's opinions because his critiques of the DSM

and the GID diagnosis it contains, both of which are rooted in empirical scientific evidence, are based upon no reliable scientific research or methodology used by others in his field.

Any challenge to the DSM classifications, which have been developed based on rigorous empirical data and peer review, must be rooted in some scientific basis. Dr. Claiborn offers none. He relies primarily upon several books and articles critiquing the DSM, the Standards of Care for Gender Identity Disorders published by the World Professional Association for Transgender Health, and two transgender advocacy documents, the International Bill of Gender Rights and the Health Law Standards of Care for Transsexualism. He also reviewed the medical records of several Plaintiffs, which did not affect his opinions in this case. (Claiborn Dep. Tr. at 19:3-6.)

The materials on which Dr. Claiborn bases his opinions, the majority of which are opinion pieces criticizing the DSM, are not rooted in reliable research or methodology and cannot sustain his conclusions. "Many times we have emphasized that experts' work is admissible only to the extent it is reasoned" and "uses the methods of the discipline." *Lang*, 217 F.3d at 924. Dr. Claiborn is not aware of whether the International Bill of Gender Rights or the Health Law Standards of Care are peer-reviewed. (Claiborn Dep. Tr. at 42:11, 45:12-17.) He speculates incorrectly that the mere fact that transgender people created the latter document may alone qualify it as peer-reviewed. (Claiborn Dep. Tr. at 45:12-20.) In fact, none of the materials relied upon by Dr. Claiborn are peer-reviewed. (Transcript of June 4, 2007 Deposition of Plaintiff's Expert Dr. George R. Brown (hereinafter "Brown Dep. Tr.") at 7.) Dr. Claiborn relies on books about the DSM written by people who were either consultants to the DSM committees or interviewed members of those committees, but that make no mention of GID. *See, e.g.*, Claiborn Dep. Tr. at 77-78 (Caplan was consultant to personality disorders committee); *id.* at 65-67 (Caplan book does not mention GID). Whereas those books criticize inclusion of other specific diagnoses in the DSM, Dr. Claiborn extrapolates to GID, without similar knowledge of the committee process, and admits he does not know how GID came to be included in the DSM. (Claiborn Dep. Tr. at 77.)

Dr. Claiborn freely admits that his concerns about the DSM and GID are based on his perception of the concerns of other advocates (Claiborn Dep. Tr. at 221), gleaned from opinion pieces, rather than any research. Although an expert may rely on the legitimate research and analysis of others, the expert must be able to evaluate the scientific reliability of the data, and not simply

-6-

accept others' assertions as true. *Dura*, 285 F.3d at 613 (expert may not simply "parrot" opinions of others).

        In short, Dr. Claiborn's opinions offered in this case are based on repeating the opinions of others about the supposed motivations of the American Psychiatric Association and the mischaracterization of GID in non-peer reviewed opinion pieces. His testimony makes it clear that he is not in a position independently to evaluate the reliability of these opinions in order to determine which mental health conditions are valid.

(Pls.' Br. in Support of Mot. to Exclude Testimony of Dr. Claiborn at 7-9.) (footnotes omitted).

The plaintiffs also contend that Dr. Claiborn's "own personal, untested theory for distinguishing valid from invalid mental health diagnoses which he uses to conclude that GID is not a legitimate diagnosis requiring treatment" is unreliable and untested. *Id.* at 9.

        Dr. Claiborn's three-factor test for determining which diagnoses are legitimate is one that neither he nor anyone else has previously proposed, tested, or peer-reviewed. *Daubert*, 509 U.S. at 593-94. He fails to show that there is a known error rate or standards to control its operation, that it is generally accepted in the field of psychology, or that there are any other standards by which the test can be judged to show its reliability. *Id.* Even Dr. Claiborn's application of his test to GID fails to show that GID is an illegitimate diagnosis.

*Id.* at 9-10.

The plaintiffs further contend that Dr. Claiborn does not connect his experience treating transgender patients to his opinion that GID does not exist, and that he fails to offer any other reliable basis for that opinion. According to the plaintiffs, Dr. Claiborn lacks the qualifications to offer any expert opinion regarding the authoritativeness of the DSM or the existence or treatment of GID.

        Although Dr. Claiborn's opinion that GID is not a legitimate mental health condition is heavily based on his critique of the DSM, he admits that he is "not an expert on the DSM and its possible political motivations" (Claiborn Dep. Tr. at 221), nor is he aware

that the revisions to the DSM are based on extensive scientific literature reviews, scientific data analysis, and scientific research. (Claiborn Dep. Tr. at 217.) Dr. Claiborn's clinical experience providing counseling for about 40 to 60 transgender people over the past three decades (Claiborn Dep. Tr. at 6:18-20; 129) does not qualify him to opine that GID does not exist and never requires treatment. Even if he had asserted that none of his patients experienced the symptoms of GID or benefitted from treatment – and he does not so assert – he could not plausibly conclude that the condition never exists. The possibility that none of his transgender patients met the diagnostic criteria for GID does not prove that the health condition itself is nonexistent.

Dr. Claiborn has never performed any research on GID or transgender issues, knows of no research that supports his assertion about the non-existence of GID, and has never written any books or articles concerning transgender people or GID. He subscribes to no journals or periodicals concerning transgender health. On certain key issues, such as suicide rates of transgender people, Dr. Claiborn testified that he was unaware of whether there are any studies on the issue. (Claiborn Dep. Tr. at 154: 12-14.) He has both largely ignored the extensive body of research regarding GID (Claiborn Dep. Tr. at 273-74) and taken an utterly unsupported position with respect to its existence. He plainly lacks the qualifications to offer such an opinion.

Finally, Dr. Claiborn's opinion that treatment for GID is never medically necessary because a variety of therapeutic treatment options exist (Claiborn Dep. Tr. at 189:19-23) is unsupported by data and confuses the existence of treatment *options* with the concept of *optional* treatment. (Brown Dep. Tr. at 128.) Indeed, his assertion is undermined by his testimony that varied treatment options exist for many valid mental health conditions, such as depression (Claiborn Dep. Tr. at 170:18-22; 272-3), whose validity as a diagnosis he does not contest. (Claiborn Dep. Tr. at 164:7-12.)

*Id.* at 12-14.

In support of their contention that his testimony is reliable, the defendants first assert that Dr. Claiborn is qualified to testify about issues relevant to this case. Dr. Claiborn's qualifications include that he holds a Ph.D. in psychology and has practiced psychology since 1970; he is licensed to practice psychology in Kansas and Missouri; he is a member of the

-8-

American Psychological Association and the Kansas Psychological Association; he is a

Fellow and board Certified Forensic Examiner of the American College of Forensic

Examiners; and he has taught in graduate psychology programs at three universities and has

taught in the Psychiatry Residency Program at the University of Kansas Medical Center. The

defendants also assert that, although Dr. Claiborn has not written books or published

nationally on transgender issues, his direct experience with transgender issues derives from

his experience treating between 30 and 50 transgendered clients.

> Second, the defendants contend that Dr. Claiborn's opinions are reliable.
>
> Dr. Claiborn will be called to testify about his opinions on the treatment needs of transgendered individuals. Those opinions are based on more than 30 years of experience as a licensed psychologist, and they are based on his treatment of a significant population of transgendered individuals.
>
> "A court may admit somewhat questionable testimony if it falls within the range where experts might reasonably differ, and where the jury must decide among the conflicting views." *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) *citing Kumho Tire*, 526 U.S. at 153 (internal punctuation omitted). The plaintiffs here are attempting to establish that Dr. Claiborn's testimony falls outside the range where experts might reasonably differ, and they do not succeed.

(Defs.' Resp. at 6.) The defendants argue that Dr. Claiborn's testimony should not be

excluded just because he believes that GID should not be included in the DSM. They also

oppose the plaintiffs' assertion that Dr. Claiborn's opinions are based solely on his

perceptions of the concerns of other advocates. Dr. Claiborn testified:

> Q. If I understand you, that bias based on who's creating the diagnosis in the DSM, is something . . . permeates the DSM entirely.
>
> I'm wondering whether there are other factors besides unequal application that would raise your suspicions about a particular diagnosis being politically motivated?

-9-

A.    No.  What raises my concern mostly is the concern of others, because I'm not an expert on the DSM and its possible political motivations, but when I read books and articles about it written by people who have studied it, and I note that they're alarmed, that's really the primary thing that alarms me.

And then when I see that they're alarmed and I look at the DSM and I find so many disorders listed in there that are inappropriate, and not really mental disorders at all, it validates to me the concern that these people have about the DSM process that more and more – and we've joked about it here today – but more and more disorders, like caffeine withdrawal and minor depressive episode, and some things that are proposed to be included in this ever-expanding comprehensiveness of the DSM, the point where many, many normal life reactions are now categorized as mental diseases.

(Defs.' Resp. at 8-9.)  The defendants contend Dr. Claiborn's methodology for determining the validity of a mental health diagnosis is valid and that the plaintiffs are free to explore this issue with Dr. Claiborn on cross-examination.  The defendants also contend that Dr. Claiborn's opinions are directly connected to his experience treating patients and his experience in the field of transgender support.

Dr. Claiborn recognizes that transgender situations exist; after all, he has treated numerous transgender patients.  He opines that those transgender situations should not be pathologized and that treatment of transgender individuals is an issue of individual choice, not medical necessity.  His report explains:

As outlined above, I do not believe the plaintiffs' transgender situations represent a mental disorder, a medical condition, or a diagnosable disease requiring treatment.  Thus, I believe, to a reasonable degree of psychological certainty, that their transgender issues do not result in serious medical needs.

The experts in the field do not view GID as a pathological entity, and my experience as a therapist, GID evaluator, and student of the literature all reinforce that the transgender individual decides which options to pursue and how far and how fast to go with regard to these life-

-10-

changing options – based on age, physical characteristics, income, employment, personality, pain tolerance, and desired lifestyle, among other considerations. The entire field of transgender support, of which I am proud to have been a member these many years, encourages this to be so. It is all about freedom to choose, not about forced choices, social judgment, stigma, shame, or approval/disapproval.

[Sullivan aff., ex. A; Report of Daniel C. Claiborn dated March 23, 2007] As the report makes clear, this opinion is based on his personal experience as a therapist, his role as a GID evaluator, his study of the psychological literature, and his membership in the field of transgender support. He testified extensively in his deposition about the role that choice plays in an individual's decision to address his or her perceived needs. [See Sullivan aff, ex. B: Claiborn dep., pp. 30-35] To the extent that the plaintiffs disagree with it, they can explore it on cross-examination.

(Defs.' Resp. at 11.)

Third, the defendants argue that allowing Dr. Claiborn to testify presents no risk of confusing a jury because there will be no jury present. "These are matters where experts can reasonably disagree, and it is the court's task to decide among the conflicting views." (Defs.' Br. at 12 [citing *S.M.*, 262 F.3d at 921].) "If Dr. Claiborn's conclusions are as flawed as the plaintiffs claim, they can highlight the flaws on cross-examination. If the court concludes that Dr. Claiborn is less credible than the plaintiffs' experts, it can give greater weight to their opinions." (Defs.' Br. at 12.)

In *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996), the court determined that the trial court had erred in excluding expert psychological and psychiatric testimony that the defendant's "confession" to the crime was false. The entire theory of the defense was that the defendant had a personality disorder which made him pathologically eager to please and susceptible to suggestion. The court explained that since the fields of psychology and psychiatry deal with human behavior and mental disorders it may be more difficult at times

to distinguish between testimony which reflects "genuine expertise" and "something that is nothing more than fancy phrases for common sense." *Id.* at 1342. In overruling the district court, the appellate court emphasized that expert testimony need not be excluded merely because it overlaps in some way with matters within the jury's experience. *Id.* at 1344.

In this case, the parties do not contend that Dr. Claiborn's testimony would not be relevant. Thus, the court turns to whether the reliability requirement of Rule 702 and *Daubert* is satisfied.

Dr. Claiborn acknowledges that he is not an expert on the DSM. His expert opinion boils down to:

> The bottom line for our purposes here is that the inclusion of Gender Identity Disorder as a "diagnosis" in the DSM-IV does not validate that entity as a disease, a medical condition, or a mental disorder. Inclusion of GID in DSM as a disorder does not imply necessary medical treatment. In fact, DSM designations of disorders do not describe, specify, or mandate treatments for any disorders.

(Defs.' Resp. at 6 [quoting Sullivan aff., ex. A: Claiborn report, p. 8].) He also opines that the plaintiffs' "transgender situations" do not represent a mental disorder, a medical condition, or a diagnosable disease requiring treatment. (Defs.' Resp. at 11.) Dr. Claiborn bases these opinions on his years of experience treating patients with transgender issues, the test of "inter-rater reliability", his study of psychological literature, and his membership in the field of transgender support.

The plaintiffs minimize the relevance of Dr. Claiborn's years of experience treating transgender patients. However, the court finds that treating 30 to 50 transgendered clients is significant, and places great weight on this experience. "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (quoting *Walker v.*

-12-

*Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000); citing *Kumho*, 526 U.S. at 156.) "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718.

Also, the court recognizes that one of the issues in this case is the treatment rendered for a serious medical need, not whether GID is a serious medical need. In this circuit, for the purposes of the Eighth Amendment, GID (or transsexualism or gender dysphoria) is a serious medical need. *Meriwether v. Faulkner*, 821 F.2d 408, 411-13 (7th Cir. 1987); *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997). Dr. Claiborn has relevant and reliable experience treating individuals with GID, or transgender issues. He may testify to the treatment of individuals with that condition in this case.

Finally, the court notes that where, as in this case, the gatekeeper and the fact finder are the same – that is, the judge – the need to make such decisions prior to hearing the testimony is lessened. *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (citing *United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005)). The scientific reliability requirement is not lessened is such situations; "the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial." *In re Salem*, 465 F.3d at 777. Thus, where the fact finder and the gatekeeper are the same, a court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702. *Id.*

Based on the foregoing, the plaintiffs' motion to exclude the expert testimony of Dr. Claiborn will be denied.

-13-

## DEFENDANTS' MOTIONS IN LIMINE

The defendants move the court for preliminary rulings on three evidentiary issues.

### 1. First Motion

First, the defendants contend that they should be allowed to present evidence of the plaintiffs' prior criminal convictions pursuant to Federal Rule of Evidence 609(a)(2). They assert that such convictions are relevant to the plaintiffs' credibility and thus should be admissible. The plaintiffs contend that the defendants should be permitted to present evidence of the plaintiffs' prior criminal convictions only if the plaintiffs testify at trial and the convictions are relevant to plaintiffs' credibility.

Federal Rule of Evidence 609 provides in relevant part:

(a)     General rule. – For the purpose of attacking the credibility of a witness,

(1) . . .

(2)     evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

(b)     Time limit. – Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

The defendants move that the following judgments of convictions be admitted pursuant to Rule 609(a) because they involve dishonesty.

a.      Kari Sundstrom, Forgery – Uttering, Wis. Stat. § 943.38(2) (felony), convicted on 7-28-05.

b.      Kari Sundstrom, Forgery, Wis. Stat. § 943.38(2), 9 counts, convicted on 8-6-93.

c.      Andrea Fields, Theft – False Representation, Wis. Stat. § 943.20(1)(D), 2 counts, convicted on 8-17-06.

d.      Andrea Fields, Forgery – Uttering, Wis. Stat. § 943.38(2), 2 counts, convicted on 10-30-2003.

e.      Vankemah Moaton, Unauthorized Use of Individual's Personal ID, Wis. Stat. § 943.201(2), 2 counts, convicted on 6-16-06.

f.      Vankemah Moaton, Forgery, convicted September 1998, Indianapolis, Indiana, 2 years probation.

g.      Vankemah Moaton, Theft by deception, convicted December 1999, Birmingham, Alabama, 2 years probation.

h.      Vankemah Moaton, Conspiracy/Counterfeiting, convicted December 2001, U.S.D.Ct. Savannah, Georgia.

I.      Kari Sundstrom, Bank Fraud and False Use of Social Security, convicted 1990, U.S.D.Ct.

(Defs.' Mot. in Limine at 1-2.)

In response, the plaintiffs contend that the court should deny the defendants' motion as to plaintiff Sundstrom's August 6, 1993, state conviction and federal convictions in 1990, since more than ten years have elapsed since the date of conviction.  Moreover, it is not clear from the record that plaintiff Sundstrom's period of incarceration for the 1990 and 1993 convictions extends into the relevant ten year period, depriving plaintiffs of fair opportunity to contest the use of such evidence.  Finally, plaintiffs assert that the probative value of these convictions is minimal in light of more recent convictions that convey the same information.

With respect to the remaining convictions, plaintiffs agree that proof of the judgments of convictions may be admitted, but only if the plaintiff or plaintiffs who committed these crimes are "witnesses" whose testimony is offered at trial and only for the purpose of impeaching their credibility. Plaintiffs assert that convictions of the plaintiffs whose testimony is not presented at trial should not be admitted, because they are not witnesses.

In reply, defendants argue that regardless of when plaintiff Sundstrom was released from confinement for the 1993 convictions of forgery and the 1990 convictions for bank fraud and false use of social security, these repeated crimes of dishonesty are relevant to and extremely probative of Sundstrom's credibility. Also, the defendants submit that if the plaintiffs do not testify, evidence of their convictions should be admissible under Federal Rule of Evidence 806.

The admission of crimes involving dishonesty or false statement under Rule 609(a)(2) is mandatory, for the purpose of attacking the credibility of a witness. However, evidence of stale convictions, that is, convictions more than ten years old or if more than ten years has elapsed since the release of the witness from confinement, are not admissible, unless the court determines that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

It is unclear at this stage whether plaintiff Sundstrom's August 6, 1993, state conviction and 1990 federal convictions are time-barred. Moreover, at this time their probative value is unclear. Hence, the defendants have failed to demonstrate that evidence of these convictions should be admitted. As for the remaining convictions, the plaintiffs do not object to their admittance if the relevant plaintiff is called as a witness. Thus, the defendants' motion will be granted in part and denied in part.

## 2. Second Motion

Second, the defendants contend that evidence of plaintiff Moaton's medical need for hormone therapy should be excluded given the invocation of plaintiff Moaton's Fifth Amendment privilege. In response, the plaintiffs contend that evidence of Vankemah Moaton's need for hormone therapy should not be excluded.

However, in their response the plaintiffs agree that plaintiff Moaton will waive the Fifth Amendment privilege and answer questions concerning prior use (and possible withdrawal) of hormone therapy, along with prior feminizing procedures. Given this stipulation, the defendants have withdrawn their motion to exclude evidence of Moaton's need for hormones and/or dismiss this plaintiff's Eighth Amendment claim on that basis, provided leave to conduct this second limited deposition outside of the deadline for completing discovery is granted. (Defs.' Reply at 3.)

## 3. Third Motion

Third, the defendants contend that highlighted portions of Dr. Randi Ettner's report should be excluded because these opinions lack sufficient foundation and exceed the doctor's qualifications. According to the defendants, several excerpts from Dr. Randi Ettner's reports go beyond the doctor's expertise as a Ph.D. psychologist. *See* Schmelzer Aff., Exs. 526, 527. For example,

> Dr. Ettner hypothesizes that plaintiff Andrea Field my [sic] have "some rare chromosomal patter," and speculates as to cause of his "abnormality of stature" (*see*, Exhibit 526, p. 7). Dr. Ettner also repeatedly states certain treatments are "medically necessary," and talks extensively about the body's endocrine system (*see generally*, the highlighted provisions of Exhibits 526, 527). Dr. Ettner, however, does not have any education or professional training in medicine or endocrinology. Hence, the highlighted portions of her reports, as reflected in Exhibits 526 and 527, should be excluded.

-17-

(Defs.' Mot. in Limine at 7.)

The plaintiffs offer that the opinions set forth in the highlighted portions of Dr. Ettner's reports fall within the doctor's expertise and experience as a clinical psychologist specializing in the treatment of GID. The defendants seek to exclude highlighted portions of Dr. Ettner's reports relating to the medical necessity of hormonal and surgical treatments for GID; offering general information about the physical effects of such treatments; and discussing the possible etiology of GID.[2]

> The highlighted portions of Dr. Ettner's testimony fall within her knowledge, training, and experience as a clinical psychologist, researcher and instructor specializing in the etiology, diagnosis and treatment of GID. Dr. Ettner has worked with 2500 gender dysphoric patients over the past three decades (Thaler Decl., Exh. F, R. Ettner Dep. Tr. at 78) and has published extensively on possible causes and treatment of GID (Thaler Decl., Exh. F, R. Ettner Dep. Tr. at 21-23; *see also* Thaler Decl., Exh. I, Curriculum Vitae of Dr. Randi C. Ettner). She is the editor of a forthcoming medical textbook entitled Principles of Transgender Medicine and Surgery (Thaler Decl., Exh. F, R. Etter Dep. Tr. at 21), and wrote the chapter of that book on the etiology of GID. (Thaler Decl., Exh. F, R. Ettner Dep. Tr. at 22.) Dr. Ettner's testimony about the nature and treatment of the health condition in which she specializes is supported by decades of clinical and research experience and should not be excluded.

(Pls.' Br. at 11.)

Dr. Ettner's experience speaks for itself. *See Smith*, 215 F.3d at 718. Moreover, the doctor has conducted research and has been an instructor specializing in the etiology, diagnosis and treatment of GID. Finally, Dr. Ettner is the editor of a medical textbook in which she wrote the chapter of that book on the etiology of GID. The court finds that Dr. Ettner is sufficiently qualified to provide expert testimony as described above. Based on the foregoing, the defendants' motion will be denied.

---

[2] The court is unable to discern what portions of Exhibits 526 and 527 are highlighted.

**PLAINTIFF'S MOTION TO EXCLUDE MEDICAL OPINIONS
OFFERED BY DEFENDANTS' EXPERT EUGENE ATHERTON**

The plaintiffs move for the exclusion of the medical opinion testimony of defendants' designated corrections expert, Eugene Atherton. In support of their motion, the plaintiffs assert that Mr. Atherton offers some opinions about the medical treatment of GID even though he has no psychological or medical "knowledge, skill, experience, training or education," as required by Federal Rule of Evidence 702. The plaintiffs request the court to limit Mr. Atherton's testimony to areas within his expertise, and to exclude any of his testimony regarding the medical diagnosis or treatment of GID, any differences of opinion with respect to its diagnosis or treatment, or the effects of such treatment.

The defendants have not filed a response to this motion. Mr. Atherton is a corrections expert and testified that his expertise is in corrections. He testified that he does not have expertise in the medical treatment of inmates. Therefore, he will not be permitted to testify in that regard. Accordingly, the plaintiffs' motion to exclude medical opinions offered by defendants' expert Eugene Atherton will be granted.

Now, therefore,

**IT IS ORDERED** that the plaintiffs' motion to exclude testimony of defendants' expert Daniel C. Claiborn (Docket #116) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion in limine (Docket #125) is **GRANTED IN PART AND DENIED IN PART** and that the convictions of the plaintiffs set forth in said motion may be admitted pursuant to Fed. R. Civ. P. 609(a) as follows, except for the convictions of plaintiff Sundstrom:

Andrea Fields:       Theft – False Representation, Wis. Stat. § 943.20(1)(D), 2 counts, convicted 8/17/06;

                     Forgery – Uttering, Wis. Stat. § 943.38(2), 2 counts, convicted 10/20/03.

Vankemah Moaton: Unauthorized Use of Individual's Personal ID, Wis. Stat. § 943.201(2), 2 counts, convicted on 6/16/06;

                     Forgery, convicted September 1998, Indianapolis, Indiana, 2 years probation;

                     Theft by Deception, December 1999, Birmingham, Alabama, 2 years probation;

                     Conspiracy/Counterfeiting, convicted December 2001, U.S.D.Ct., Savannah, Georgia.

**IT IS FURTHER ORDERED** that the plaintiffs' motion to exclude medical opinions testimony regarding medical treatment of inmates is **GRANTED** as to Eugene Atherton (Docket #127).

Dated at Milwaukee, Wisconsin, this 5th day of October, 2007.

BY THE COURT:

s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
United States District Judge