# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KARI SUNDSTROM,
ANDREA FIELDS,
LINDSEY BLACKWELL,
MATTHEW DAVISON,
also known as Jessica Davison,
and VANKEMAH D. MOATON,

        Plaintiffs,

      v.                                    Case No. 06-C-112

MATTHEW J. FRANK,
WARDEN JUDY P. SMITH,
THOMAS EDWARDS,
JAMES GREER,
ROMAN KAPLAN, MD,
WARDEN ROBERT HUMPHREYS,
and MANAGER SUSAN NYGREN,

        Defendants.

---

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. #120), GRANTING PLAINTIFFS'
MOTION FOR LEAVE TO FILE SURREPLY (DOC. #163), DISMISSING DEFENDANTS
HUMPHREYS AND NYGREN, AND DISMISSING PLAINTIFFS SUNDSTROM AND
BLACKWELL

      Before the court is the defendants' motion for partial summary judgment.

Defendants' Statement of the Case follows:

      The plaintiffs, all current or former inmates in the
Wisconsin prison system, filed this action on January 24, 2006,
against the defendants, all Wisconsin Department of Corrections
(DOC) officials. The plaintiffs have all been diagnosed as
suffering from some form of gender identity disorder. In their
Third Amended Complaint (Complaint), the plaintiffs challenge
the Inmate Sex Change Prevention Act (the Act), Wis. Stat. §
302.386(5m), which prevents state or federal resources to be
used to provide hormone therapy or sexual reassignment surgery
to Wisconsin prisoners. The statute defines "hormonal therapy"

as "the use of hormones to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender." Wis. Stat. § 302.386(5m)(a)(1). It also defines "sexual reassignment surgery" as "surgical procedures to alter a person's physical appearance so that the person appears more like the opposite gender." Wis. Stat. § 302.386(5m)(a)(2).

The Complaint sets forth essentially three claims: (1) the Act, as applied to the plaintiffs, violates the Eighth Amendment; (2) the Act, on its face, violates the Eighth Amendment; and (3) the Act violates the plaintiffs' Fourteenth Amendment equal protection rights. As relief, the plaintiffs request injunctive relief against DOC's enforcement of the Act against them, along with declaratory relief holding the Act, both on its face and as applied to plaintiffs, violates the Eighth and Fourteenth Amendments to the constitution.

By this motion, the defendants seek summary judgment on the following claims: (1) Plaintiff Moaton's Eighth Amendment as-applied challenge to the Act; (2) the Eighth Amendment facial challenge to the Act; (3) all claims brought by plaintiffs Sundstrom and Blackwell; (4) all claims brought against defendants Humphreys and Nygren; and (5) the Fourteenth Amendment equal protection claim.

(Defs.' Br. in Support of Mot. for Summ. J. at 2-3.)

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*,

2

477 U.S. at 248. A dispute of "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings . . . "). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*k, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS[1]

---

[1] In this section, Defendants' Proposed Findings of Fact (DFOF) are set forth first, along with Plaintiffs' Response to Defendants' Proposed Findings (PRDFOF), and Defendants' Reply to Plaintiffs' Response to Defendants' Proposed Findings of Fact (DReply). Next, Plaintiffs' Proposed Findings of Fact (PFOF) are set forth, including Plaintiffs' Amended Proposed Finding of Fact Number 20, along with Defendants' Response to Plaintiffs' Findings of Fact (DRPFOF).

3

Plaintiff Kari Sundstrom is an anatomical male and was an inmate incarcerated at the Oshkosh Correctional Institution (OSCI). (DFOF ¶ 1.) On December 12, 2006, Sundstrom was released from DOC incarceration. Plaintiff Andrea Fields is an anatomical male and an inmate incarcerated at OSCI. (DFOF ¶ 2.) Plaintiff Lindsay Blackwell is an anatomical male and was previously an inmate incarcerated at the Racine Correctional Institution (RCI). (DFOF ¶ 3.) On October 10, 2006, Blackwell was released from DOC incarceration. Plaintiff Matthew Davison is an anatomical male and an inmate incarcerated at OSCI. (DFOF ¶ 4.) Plaintiff Vankemah Moaton is an anatomical male and an inmate currently incarcerated at the Jackson Correctional Institution. (DFOF ¶ 5.)

Defendant Matthew J. Frank was the Secretary of the State of Wisconsin Department of Corrections when this action was filed. (DFOF ¶ 6.) Defendant James Greer is the Director of the DOC Bureau of Health Services. (DFOF ¶ 7.) Defendant Judy P. Smith is the Warden at OSCI. (DFOF ¶ 8.) Defendant Thomas Edwards is the Health Services Manager of the OSCI Health Services Unit. (DFOF ¶ 9.) Defendant Robert Humphreys is the Warden at RCI. (DFOF ¶ 10.) Defendant Susan Nygren is the Health Services Manager of the RCI Health Services Unit. (DFOF ¶ 11.)

The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, Sixth Version (Standards of Care) refer to three elements or phases of therapy once a person is diagnosed with gender identity disorder, which include: (1) a real-life experience in the desired role; (2) hormones of the desired gender; and (3) surgery to change the genitalia and other sex characteristics. The Standards of Care refer to these three phases as triadic therapy. (DFOF ¶ 12.)

The Standards of Care state that "the diagnosis of GID invites consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad. Clinicians have increasingly become aware that not all persons with gender identity disorders need or want all three elements of triadic therapy."[2] (Docket No. 5, Dupuis Declaration, Exhibit E, Standards of Care for Gender Identity Disorders, Sixth Version, p. 3) (DFOF ¶ 13.) The Standards of Care state that "[m]any adults with gender identity disorder find comfortable, effective ways of living that do not involve all the components of the triadic treatment sequence." (Doc. No. 5, Dupuis Declaration, Exhibit E, Standards of Care for Gender Identity Disorders, Sixth Version, p. 9).[3] (DFOF ¶ 14.)

Before hormone therapy is administered to a GID patient, the Standards of Care recommend that a letter from a mental health professional be written to the physician who will be responsible for the patient's medical treatment. This letter should succinctly specify: (1) the patient's general identifying characteristics; (2) the initial and evolving gender, sexual and

---

[2]Plaintiffs do not dispute that this is an accurate quotation for the Standards of Care. However, plaintiffs dispute defendants' implication that this quotation means that hormone therapy and sex reassignment surgery can never be medically necessary treatments for GID. Based on the standards of care medically necessary treatment for GID most often involves hormone therapy or surgical interventions. Dr. Randi Ettner testified, "[W]e know that untreated as many as 35 percent of patients [with GID] will commit suicide. And the treatment for the disorder most often involves hormones and/or surgical interventions. So those are the appropriate and medically necessary treatment for this disorder." (Knight Decl., Exh. 213, R. Ettner Dep. Tr. at 51.) The process of determining what treatments are medically necessary for a patient with GID involves an individualized evaluation and assessment. The Standards of Care state that, "[i]n persons diagnosed with transsexualism or profound GID, sex reassignment surgery, along with hormone therapy and real-life experience, is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary." (Docket No. 5, Dupuis Declaration, Exhibit E, *Standards of Care for Gender Identity Disorders, Sixth Version* at 18.) The only medical treatment that effectively relieves suffering caused by severe GID is hormone therapy or surgery to bring anatomy and appearance into alignment with gender identity. (PRDFOF ¶ 1.)
        Defendants dispute plaintiffs additional assertions of fact. In addition, plaintiffs' expert, Dr. Frederic Ettner, testified that not every individual with GID needs to be on hormones.

[3] Plaintiffs incorporate by reference their response to DFOF ¶ 13 above. (PRDFOF ¶ 2.) Defendants incorporate by reference their reply to DFOF ¶ 13 above. (DReply ¶ 14.)

other psychiatric diagnoses; (3) the duration of their professional relationship including the type of psychotherapy or evaluation that the patient underwent; (4) that eligibility criteria have been met and the mental health professional's rationale for hormone therapy; (5) the degree to which the patient has followed the Standards of Care to date and the likelihood of future compliance; (6) whether the author of the report is part of a gender team; and (7) that the sender welcomes a phone call to verify that the mental health professional wrote the letter. (DFOF ¶ 15.) The Standards of Care state that "[g]enital surgery is not a right that must be granted upon request." (Doc. No. 5, Dupuis Declaration, Exhibit E, Standards of Care for Gender Identity Disorders, Sixth Version, p. 18).[4] (DFOF ¶ 16.)

During the deposition of plaintiff Vankemah Moaton on June 21, 2007, plaintiffs' counsel Laurence Dupuis voiced the following objection:

> I'm going to object and actually direct [Moaton] not to answer questions about her interactions with – about her taking hormones prior to 2004 on grounds of Fifth Amendment Privilege.

(Schmelzer Aff., Exhibit 531, p. 18). (DFOF ¶ 17.) During the deposition of plaintiff Vankemah Moaton on June 21, 2007, plaintiffs' counsel, Laurence Dupuis, voiced the

---

[4] Plaintiffs do not dispute that this is an accurate quotation from the Standards of Care. However, plaintiffs assert that this proposed finding of fact is immaterial. This action does not seek any particular form of treatment for plaintiffs, nor do plaintiffs claim that genital surgery is a right that must be granted upon request, to them or to anyone else. Rather, plaintiffs seek the treatments that DOC physicians determine to be medically necessary for them based on individualized evaluation. Before the provision of sex reassignment surgery could even be considered, a GID diagnosis must be made, which includes a finding of "clinically significant distress or impairment in social, occupational, or other important areas of functioning." (Knight Decl., Exh. 232, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition - Text Reference (DSM-IV) at 581.) In addition, the Standards of Care do not permit genital surgery until the patient with GID has met strict eligibility and readiness criteria. Sex reassignment surgery is not cosmetic or elective; rather, for some individuals with severe GID, it is the only effective treatment for their condition. Some such individuals suffer so profoundly without effective GID treatment that they mutilate their own genitals, essentially performing their own makeshift sex reassignment surgery. For anatomic males with severe GID, "having a female anatomy reconstructed is their therapy." (Knight Decl., Exh. 218, F. Ettner Dep. Tr. at 34.) (PRDFOF ¶ 3.)

As to plaintiffs' objections, defendants maintain that this proposed finding is material in that it supports their view that not every application of the Inmate Sex Change Prevention Act, Wis. Stat. § 302.386(5m), is unconstitutional. (DReply ¶ 16.)

6

following objection to defense counsel's inquiry about feminizing procedures Moaton has had done:

> On these procedures I'm going to direct [Moaton] not to answer any questions after the end of 2000 on the same grounds as before, so she can describe things that happened up until the end of 2000.

(Schmelzer Aff., Exhibit 531, p. 36). (DFOF ¶ 18.) Dr. Randi Ettner's report notes that Moaton "underwent facial and body feminizing procedures to attain an authentic female presentation. She began taking hormones eleven years ago." The report adds that while in prison in Minnesota, Moaton "was able to taper off medication." (Schmelzer Aff., Exhibit 527, pp. 8).[5] (DFOF ¶ 19.)

A portion of Dr. Ettner's report reads: "[g]ender identity disorder, previously known as transexualism, is an extremely rare and misunderstood disorder, with an incidence of 1 in 11,900 natal males and 1 in 30,400 females." (Schmelzer Aff., Exhibit 526, p. 1). (DFOF ¶ 20.) Continuing, Dr. Ettner's report states that, "[h]owever, as the field matured, professionals became aware that not all persons with bona fide gender identity disorders desired or were candidates for sex reassignment surgery." (Schmelzer Aff., Exhibit 526, p. 10). (DFOF ¶ 21.) Another portion of Dr. Ettner's report provides that, "[i]n select cases, incarcerated persons who meet these criteria may be candidates for medically ordained surgical treatment." (Schmelzer Aff., Exhibit 526, p. 13). (DFOF ¶ 22.)

---

[5] Plaintiffs do not dispute that these are accurate quotations of portions of Dr. Randi Ettner's report. However, they dispute defendants' suggestion that because plaintiff was taken off hormones for a time several years ago means that they are not medically necessary now. (PRDFOF ¶ 4.)

Defendants dispute plaintiffs' additional assertions of fact. This dispute, however, is not material as it related to the defendants' motion for summary judgment. (DReply ¶ 19.)

Case 2:06-cv-00112-CNC   Filed 10/15/07   Page 7 of 43   Document 175

Dr. George Brown's report advises that "SRS is a last resort treatment, reserved for those who have not been able to find less invasive ways to treat their condition." (Schmelzer Aff., Exhibit 516, p. 9). (DFOF ¶ 23.) The deposition of Lindsay Blackwell's deposition of May 2, 2006, included the following exchange:

> Q: So you feel that the Department of Corrections should provide you with breast implants?
> A: No, with the proper stages that we're supposed to go through.
> Q: Tell me what those stages are then.
> A: The counseling.

(Schmelzer Aff., Exhibit 534, p. 36).[6] (DFOF ¶ 24.) The following was stated during the May 3, 2006, deposition of Andrea Fields:

> Q: Do you want to have other surgeries?
> A: Yes.
> Q: What other surgeries do you want to have.
> A: I want to do the whole sex change.
> Q: Okay. So that – is that what's known as gender reassignment surgery?
> A: Yes.
> Q: Are you also looking to – strike that. Do you feel like you're ready for that now?
> A: Yes, I am.
> Q: Do you feel that that's something that the Department of Corrections
> should provide for you?

---

[6] Plaintiffs do not dispute the accuracy of this quotation. However, they take issue with defendants' implication that this quotation means that medically necessary treatment is determined by a transgender inmate evaluation by a medical provider, and that sex reassignment surgery is never medically necessary for inmates. It has been stated that gender dysphoria resulting from GID "appears to intensify over a lifetime, escalating with age." (Knight Decl., Exh. 217, June 28, 2006 R. Ettner Report at 13; Knight Decl., Exh. 216, Kallas Dep. Tr., 7/19/07, at 82.) Several opinions expressed in this case are that the determination that hormones or surgery are medically necessary treatments for some inmates with GID does not take place until after they have been incarcerated. For some individuals with GID, sex reassignment surgery is a medically necessary treatment that eliminates gender dysphoria. (PRDFOF ¶ 5.)

Defendants dispute plaintiffs' additional assertions of fact. The suggestion that hormones or surgery would be imposed upon an inmate with GID who does not want this form of treatment is inconceivable. The Standards of Care expressly require informed consent for initiation of hormone treatment, and further require, at a minimum, patient consent for reassignment surgery. The medical necessity of these forms of treatment is also disputed.

8

A: No.

(Schmelzer Aff., Exhibit 535, pp. 75-76).[7]  (DFOF ¶ 25.)  Kari Sundstrom's deposition of May

3, 2006, included the following:

> Q: Do you believe that the Department of Corrections should
> provide you with gender reassignment surgery?
> A: Do I?
> Q: Yeah.
> A: For me personally? Not for me.

(Schmelzer Aff., Exhibit 536, p. 36)[8] (DFOF ¶ 26.)

Walter Kautzky's report submits that, "Gender Identity Disorder and the

presentation of effeminate characteristics create challenges in a prison setting, but those

problems are not different than complexity of mental illness or HIV positive inmates."

(Schmelzer Aff., Exhibit 533, pp. 15-16).[9]  (DFOF ¶ 27.)  Walter Kautzky testified on May 31,

2007:

> Q: So let me see if I understand you correctly.  If a prisoner is
> perceived as being sexually available, is it your testimony that that
> increases the possibility that the prisoner may be sexually
> assaulted by other prisoners?
> A: That's correct, yes.
> Q: Is it your belief that inmates who cross-dress are perceived as
> sexually available?

---

[7] Plaintiffs incorporate by reference their response to DFOF ¶ 24, *supra*.  (PRDFOF ¶ 6.)
Defendants incorporate by reference their response to DFOF ¶ 24 *supra*.  (DReply ¶ 25.)

[8] Plaintiffs incorporate by reference their response to DFOF ¶ 24 *supra*.  (PRDFOF ¶ 7.)
Defendants incorporate by reference their response to DFOF ¶ 24 *supra*.  (DReply ¶ 26.)

[9] Plaintiffs do not dispute the accuracy of this quotation, but dispute defendants' implication that
this quotation means that inmates with GID demand more correctional resources than do other inmates.  Mr.
Kautzky testified that he has never known inmates with GID to create extra staffing burdens.  (PRDFOF ¶ 8.)
     Defendants dispute plaintiffs' additional assertions of fact.  Atherton has stated that feminization
of inmates in a male prison increases the work demand of existing staff, and that this will cause resources to be
drawn from attendance to the other operations duties in the institution that are also likely to involve safety and
control.  Defendants further assert that this is not a dispute of material fact as it relates to the defendants' motion
for summary judgment.  (DReply ¶ 27.)

A: Yes.

Q: Is it your belief that inmates who display effeminate characteristics are viewed as sexually available?

A: Yes.

(Schmelzer Aff., Exhibit 533, pp. 34-35).[10]  (DFOF ¶ 28.)  Walter Kautzky testified on May 31, 2007, stating:

Q: Would it present security concerns for a male inmate to spend a year living as a female inmate?

---

[10] Plaintiffs do not dispute the accuracy of this quotation.  However, they dispute defendants' implication that this means that inmates who receive medically necessary treatment for GID are perceived as more sexually available by other inmates and will consequently be sexually assaulted following hormone therapy. Any implication regarding the effects of cross-dressing is immaterial, because this lawsuit does not involve clothing.  Cross-dressers or transvestites are a distinct category from transsexuals or people with GID.  The DSM lists Transvestic Fetishism as a separate diagnosis from GID.  Furthermore, individuals with effeminate characteristics do not necessarily have GID.  "Femininity is a broad range.  Some [feminine inmates] may have GID.  Some maybe not."  (Knight Decl., Exh. 221, Atherton Dep. Tr. at 35.)  In addition, it is impossible to predict or generalize about the amount of external feminization that results from administration of hormone therapy to individuals with GID.  "Heredity limits the tissue response to hormones and this cannot be overcome by increasing dosage.  The degree of effects actually attained varies from patient to patient."  (Docket No. 5, Dupuis declaration, Exhibit E, *Standards of Care* at 14.)  The degree to which hormone therapy induces feminization for a particular person with GID cannot be ascertained by prison security experts, but rather can only be determined by medical experts.  Defendants produce no evidence indicating that denying medically necessary treatments to an inmate with GID decreases effeminate demeanor or similar characteristics.

Plaintiffs further dispute any implication that this quotation means Kautzky believes that inmates with GID are more vulnerable because they take hormones or that GID treatment cannot be administered in a prison setting.  Kautzky testified that prison administrators should follow medical instructions.  Moreover, Kautzky testified that, if an inmate was at risk of suicide or self-harm without sex reassignment surgery, and if a prison committee of health care providers recommended that surgery be provided to that inmate, then prison administrators "would have to take those steps based on the best medical advice that they had."  (Knight Decl., Exh. 220, Kautzky Dep. Tr. at 185-86.)  (PRDFOF ¶ 9.)

As to plaintiffs' additional assertions of fact, defendants submit that plaintiffs' expert describes the feminizing effects hormones have on a male inmate:

Testosterone is a very potent hormone, and reversing its effects is not entirely possible.  However, administering estrogen compounds and anti-androgenic compounds creates changes in the brain, and **visible changes in the body**, of a natal male.  These include: **Notable increase in breast size, smoothing and softening of skin, change in subcutaneous fat distribution**, shortening of the penis, loss of size and volume of the testes, reduction in the size of the prostate gland, change in lipid profile, and preservation of bone mass.

(Schmelzer Aff., Docket No. 124, Exhibit 526, p. 11) (emphasis added).  To argue male inmates on female hormone therapy do not display effeminate characteristics is nonsensical and contrary to Dr. Ettner's opinion.  Indeed, the Act in question *only* applies when hormones are used "to simulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender."  Wis. Stat. § 302.386(5m)(a)(1).  Similarly, only surgical procedures that "alter a person's physical appearance so that the person appears more like the opposite gender" are prevented under the Act.  Wis. Stat. § 302.386(5)(a)(2).  (*See also*, PFOF ¶ 6).  The remainder of the plaintiffs' assertions are not material facts as it relates to the defendants' motion for summary judgment.  (DReply ¶ 28.)

10

A: Would it present security concerns. And I think my answer would be there probably would be security concerns for any highly effeminate inmate whether they were undergoing gender identity disorder, real life experience or not. And I think the research from BJS is real clear that inmates who are highly effeminate or known homosexuals or in other cases, you know, known transgender inmates may, you know, not be homosexual, have nothing to do with homosexuality do, in fact, by virtue of presenting themselves as highly effeminate people present additional security concerns, yes.

(Schmelzer Aff., Exhibit 533, p. 155).[11] (DFOF ¶ 29.) Walter Kautzky further testified:

Q: All other things being equal, is an inmate who is more feminine than another inmate at increased risk of victimization?
A: According to the research, yes.
Q: And you agree with that?
A: Yes, sir.

(Schmelzer Aff., Exhibit 533, p. 161). (DFOF ¶ 30.) Continuing, Kautzky stated:

Q: Would you agree with me that correctional institutions should not create conditions that make inmates more vulnerable to assault?
A: Would I agree that institutions should not make – create conditions that would make inmates more vulnerable to assault? Yes, I would agree with that.

(Schmelzer Aff., Exhibit 533, pp. 161-162). (DFOF ¶ 31.)

On June 20, 2007, Matthew Davison was deposed and testified:

---

[11] Plaintiffs do not dispute the accuracy of this quotation. However, this proposed finding is misleading because it is taken out of context. This quotation refers to the Real Life Experience, a period of living as a different gender that is recommended by the Standards of Care prior to certain forms of sex reassignment surgery. The Real Life Experience may be possible in a prison setting. Regardless, however, facilitation of the Real Life Experience in a prison setting is not at issue in this case. Furthermore, even if the Real Life Experience were relevant to this case, it is not a prerequisite for administration of hormone therapy. The Standards of Care acknowledge that some forms of sex reassignment surgery can be appropriate even without RLE. Contrary to defendants' implication, provision of hormone therapy or sex reassignment surgery does not necessarily require the prison to facilitate a female gender role for an inmate by providing access to makeup or female clothing, nor do plaintiffs seek this. (PRDFOF ¶ 10.)

Defendants submit that as to plaintiffs' additional assertions, Mr. Kautzky's response speaks for itself. Though asked about the real life experience, Mr. Kautzky's response was clearly broader in scope, and he clearly stated that highly effeminate inmates present additional security concerns. (DReply ¶ 29.)

Q: Do you think you're able to live as a woman here in prison?
A: In a male institution, it's hard.
Q: Why is that?
A: The men trying to get on you, harass a lot by staff and inmates. I'm pretty much perceived as a female in here.
Q: Is prison life different than life outside prison?
A: Yes.
Q: Is it a lot different?
A: Yes. You've got to be much more careful.
Q: Do you think they make you more of a target for men trying to get on you and harass here in prison?
A: I'm not sure how to answer that.
Q: Do you think some of the physical effects that you've seen result from – I'll finish for the record. Some of the physical effects that you have seen from female hormones make you more of a target for men trying to get on you and being harassed here in prison?
A: Yes.
Q: When you say men trying to get on you, what do you mean by that?
A: Trying to have sex.

(Schmelzer Aff., Exhibit 532, pp. 43-44). (DFOF ¶ 32.) According to plaintiff Matthew Davison, another inmate raped Davison and, in a separate incident, was also molested by yet another inmate. (DFOF ¶ 33.)

In this action, plaintiffs ask that DOC health care providers be allowed to provide them with medically necessary treatments for their serious health condition, Gender Identity Disorder (GID).[12] (PFOF ¶ 1.)

Gender Identity Disorder and its Treatment

GID is a serious health condition classified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th edition - Text

---

[12] Defendants dispute that plaintiffs have a serious medical need that requires medically necessary treatments. (DRPFOF ¶ 1.)

Revision).[13]  (PFOF ¶ 2.)  In its most severe manifestation, GID is referred to as transsexualism.  The DSM is the official diagnostic manual used by nearly all mental health providers.[14]  (PFOF ¶ 3.)  Ordinarily, a GID diagnosis is made when the following criteria are present: 1) a strong and persistent cross-gender identification; 2) a persistent discomfort with one's sex or a sense of inappropriateness in the gender role of that sex; 3) the disturbance is not concurrent with a physical intersex condition; and 4) the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.[15]  (PFOF ¶ 4.)  Also, cross-gender identification cannot be reversed through psychotherapy.  (PFOF ¶ 5.)  According to Dr. Frederic Ettner, M.D.:  "Once you're born with gender identity disorder, you stay with gender identity disorder, whether you're withdrawn from therapy or on therapy."  (Knight Decl., Exh. 218, F. Ettner Dep. Tr. at 32.)

To alleviate the psychological distress or impairment caused by GID, many male-to-female transsexuals seek to express their female gender identity through appearance, mannerisms, name and pronoun choices, or by otherwise identifying and expressing themselves as women.  (PFOF ¶ 6.)  Significantly, many do so well before hormone therapy.

Transsexual health experts have determined that hormone therapy and sex reassignment surgery are medically necessary treatments for some individuals with GID.  This determination is supported by the Standards of Care, which are accepted worldwide, and

---

[13] Defendants dispute that "GID is a serious health condition."  (DRPFOF ¶ 2.)

[14] Defendants dispute.  (DRPFOF ¶ 3.)

[15] Defendants do not dispute that this is the diagnostic criteria for GID in the DSM-IV. Defendants object to the statement "GID is properly diagnosed when the following criteria are present" as not supported by the evidentiary material cited.  (DRPFOF ¶ 4.)

13

represent the consensus of professionals regarding the psychiatric, medical and surgical management of GID. Untreated GID "will cause disastrous results quite often." (Knight Decl., Exh. 213, R. Ettner Dep. Tr. at 51.) No treatments can substitute for hormone therapy or sex reassignment surgery for people with GID who have a medical need for such treatments.[16] (PFOF ¶ 7.)

DOC medical personnel agree that hormone therapy and sex reassignment surgery are medically necessary treatments for some individuals with GID. As Dr. David Burnett, DOC Medical Director, stated in his deposition of June 12, 2006:

> Q: Is it your professional medical opinion that gender identity disorder is a health condition that requires treatment?
> A: Yes, I would agree with that, that it requires treatment and evaluation.
> Q: To your knowledge, what are the commonly-accepted forms of treatment for gender identity disorder?
> A: My understanding is there is what is referred to as the triad system in terms of hormonal therapy, living in a real-life situation and surgical therapy.

---

[16] Defendants dispute. Transgender issues and GID do not result in a serious medical need and do not require treatment. Rather, each transgender individual decides which options to pursue and how far and how fast to go with regard to these life-changing options. Some elect hormone therapy without surgery. Some elect cosmetic surgery. Some cross-dress and cross identify in select circumstances only. Each individual does what they need and can accept and can afford, not what is "required." It is undisputed that the Standards of Care state:

> However, the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad. Clinicians have increasingly become aware that not all persons with gender identity disorders need or *want* all three elements of triadic therapy.
> ....
> The therapist should make clear that it is the patient's right to *choose among many options*.
> ....
> Hormone therapy can provide significant comfort to gender patients *who do not wish to* cross live or undergo surgery, or who are unable to do so.
> ....
> Although professionals may recommend living in the desired gender, the decision as to when and how to begin the real-life experience remains the person's responsibility.

(Docket No. 5, Dupuis Declaration, Exhibit E, *Standards of Care for Gender Identity Disorders, Sixth Version*, pp. 3, 10, 12, 15.) Whether this choice is termed "treatment" by plaintiffs' experts and the SOC or not, it cannot be disputed that a GID patient *chooses* what conditions would sufficiently alleviate distress caused by their condition. (DRPFOF ¶ 7.)

14

(Knight Decl., Exh. 222, Burnett Dep. Tr. at 35-36.)  Dr. Kevin Kallas, DOC Mental Health

Director, agrees that "gender identity disorder is a condition that needs treatment, and to

prohibit that treatment in a blanket way without taking into account the individual

circumstances of offenders is not a good idea."  (Knight Decl., Exh. 215, Kallas Dep. Tr.,

6/12/06, at 14-15.)  He further agrees that the DOC considers treatment necessary for some

inmates with GID, and that Act 105 "takes away medically necessary treatment."  (Knight

Decl., Exh. 215, Kallas Dep. Tr., 6/12/06, at 14-15.)[17]  (PFOF ¶ 8.)

        DOC medical personnel admit that for some individuals, failure to provide

medically necessary hormone therapy could cause adverse consequences to psychological

well-being, including ongoing gender dysphoria, depression, anxiety, and, for some, even

suicidal ideation.  Other risks of not providing hormone therapy to a person with GID include

"a higher risk of alcohol and drug use or dependency issues. . . . [and] some increased risk

of borderline behaviors which could involve cutting on one's self, as an example."  (Knight

Decl., Exh. 224, Hull Dep. Tr. at 28.)[18]  (PFOF ¶ 9.)  Hormone therapy might relieve the desire

to self-castrate that is sometimes caused by GID.  Hormone therapy is one of the mainstays

of treatment for GID.[19]  (PFOF ¶ 10.)

---

[17] Defendants object to the statement that "sex reassignment surgery" is "medically necessary treatment [] for some individuals with GID" as not supported by the evidentiary materials cited.  Defendants do not dispute that these were statements made by Dr. Kallas and Dr. Burnett, but dispute the accuracy of those opinions.  (DRPFOF ¶ 8.)

[18] Defendants do not dispute that these were the opinions of Dr. Kallas, Mr. Greer, and Dr. Hull, but dispute the accuracy of those opinions.  (DRPFOF ¶ 9.)

[19] Defendants object to the statement "[h]ormone therapy might relieve the desire to self-castrate that is sometimes caused by GID" as not supported by the evidentiary materials cited.  Defendant do not dispute that the remainder of this proposed finding is the opinion of Dr. Kallas, but dispute the accuracy of those opinions. (DRPFOF ¶ 10.)

For a treatment to be medically necessary, it does not have to be a treatment for an emergency condition, but could be a chronic condition like gender dysphoria.[20] (PFOF ¶ 11.) DOC personnel agree that, for some prison inmates with GID, sex reassignment surgery could be medically necessary.[21] (PFOF ¶ 12.) Hormone therapy provided by DOC physicians is medically necessary care for the plaintiffs. In the deposition of Dr. David Burnett, DOC Medical Director, taken on June 12, 2006, the following was said:

> Q: Do you have an opinion about whether the hormone therapy that those three inmates are receiving is medically necessary?
> A: Well, I believe that it is.
> Q: Why do you believe that?
> A: Well, I don't believe that our physicians would prescribe it if it wasn't medically necessary.

(Knight Decl., Exh. 222, Burnett Dep. Tr. at 53-54.) Dr. Randi C. Ettner, who conducted evaluations of each plaintiff, agrees that hormone therapy is medically necessary for the plaintiffs that Dr. Ettner examined.[22] (PFOF ¶ 13.)

Removing an individual with GID from existing hormone therapy treatment creates the risk of negative health consequences on one or more body systems, including the brain and the metabolic systems, and can cause loss of bone density, increased risk of infection, and elevated lipids, leading to a heightened risk of heart disease or stroke. In addition to these medical risks and consequences, hormone withdrawal is accompanied by

---

[20] Defendants do not dispute that this is the opinion of Dr. Kallas, but dispute the accuracy of those opinions. (DRPFOF ¶ 11.)

[21] Defendants object to this proposed finding as not supported by the evidentiary materials cited. (DRPFOF ¶ 12.)

[22] Defendants do not dispute that this accurately recites Dr. Burnett's deposition testimony, and that Dr. Ettner found a medical necessity for each plaintiff, but dispute the accuracy of those opinions. (DRPFOF ¶ 13.)

16

psychological and emotional risks and consequences, including depression and suicidal thoughts. (PFOF ¶ 14.)

DOC medical personnel agree that severe mental and physical health risks are associated with removing individuals with GID from hormone therapy treatment. Suicidal ideation is one risk of removing a patient with GID from their hormone therapy. Other medical consequences of hormone withdrawal include risk of self-mutilation; reversal or partial reversal of the changes induced by the hormones (such as breast development or redistribution of body fat); menopause-like symptoms; hot flashes, hair loss, mood swings, depression, and agitation; gender dysphoria, and a sense of loss. "Any preexisting psychiatric condition could worsen on the basis of being off hormones," including depression. (Knight Decl., Exh. 215, Kallas Dep. Tr. 6/12/06, at 33-35.) Some of these risks may require treatment with antidepressants or psychotropic medications. Restoration of hormones reverses these effects.[23] (PFOF ¶ 15.)

DOC administrative personnel agree that on health care matters, deference should be given to DOC health care staff. In the deposition of Judy Smith, Warden of Oshkosh Correctional Institution, taken on August 15, 2007, the following was stated:

> Q: Would it be fair to say that you would defer to prison psychiatrists and psychologists in determining whether or not a particular condition warrants treatment in the prison setting?
> A: Yes.

---

[23] Defendants object to the statement that DOC medical personnel agree that "severe mental and physical health risks" are associated with removing individuals with GID from hormone therapy treatment, as not supported by the evidentiary materials cited. They do not dispute the remainder of this proposed finding. (DRPFOF ¶ 15.)

(Knight Decl., Exh. 225, Smith Dep. Tr. at 59.) (PFOF ¶ 16.) Prison security experts agree that they should follow the advice of prison health care providers regarding health care issues. (PFOF ¶ 17.)

Male-to-female transsexual inmates who seek hormone therapy in prison, notwithstanding any risks they perceive from any feminizing effects of those hormones, often express their feminine identity even in the absence of treatment or in ways that supplement the effects of the hormones.[24] (PFOF ¶ 18.)

Act 105

Prior to the passage of Act 105, DOC provided hormone therapy where medically necessary for inmates with GID.[25] (PFOF ¶ 19.) Sometimes, DOC prescribes hormone therapy for reasons that do not have to do with GID, such as estrogen replacement therapy in post-menopausal years, or for inmates with a congenital or hormonal disorder that requires the administration of hormone therapy. (PFOF ¶ 20.) Only inmates with GID are singled out for the denial of medically necessary treatment.[26] (PFOF ¶ 20, amended.)

The sponsors of Act 105 labeled it the "Inmate Sex Change Prevention Act." (PFOF ¶ 21.) Press releases were issued by the sponsors of Act 105 prior to passage of the legislation stating that it was intended to prevent "bizarre taxpayer funded sex change procedure," (Knight Decl., Exh. 227, Margolies Dep. Tr. at 29; Knight Decl., Exh. 246,

---

[24] Defendants object to this proposed finding on the grounds that the evidentiary materials cited herein does not support this general proposition. (DRPFOF ¶ 18.)

[25] Defendants do not dispute that DOC provided hormone therapy to some inmates with GID prior to the passage of Act 105. They dispute that hormone therapy was medically necessary. (DRPFOF ¶ 19.)

[26] Defendants dispute the statement "[o]nly inmates with GID are singled out for the denial of medically necessary treatment." (DRPFOF ¶ 20.)

18

Margolies Dep. Exh. 266), and to stop the DOC policy of "[allowing] pharmacists within the corrections system to give hormones to an inmate diagnosed with gender identity disorder." (Knight Decl., Exh. 227, Margolies Dep. Tr. at 29; Knight Decl., Exh. 246, Margolies Dep. Exh. 267.) (PFOF ¶ 22.) Several of the press releases noted that the issue of sex reassignment treatment for inmates came to light when they learned that a Wisconsin transgender inmate was receiving treatment that led her to develop "female characteristics, such as breasts." (Knight Decl., Exh. 227, Margolies Dep. Tr. at 27-28; Knight Decl., Exh. 246, Margolies Dep. Exhs. 263, 265.) (PFOF ¶ 23.)

The legislative history of Act 105 shows that it was conceived and intended to prevent administration of treatment for Gender Identity Disorder. The record does not disclose any other medical testimony or arguments based on medical opinion that were presented during the only other hearing concerning Act 105. (Assembly Bill 184)[27] (PFOF ¶ 24.)

Officially, DOC took a neutral position on Act 105.[28] (PFOF ¶ 25.) However, DOC medical personnel oppose Act 105's limitation on medical decision-making. In his March 2005 Senate testimony regarding Act 105, Dr. Kallas stated that the cons of Act 105 "far outweighed the pros" (Knight Decl., Exh. 215, Kallas Dep. Tr., 6/12/06, at 114-15), and that GID "is worthy of treatment in selected cases." (Knight Decl., Exh. 215, Kallas Dep. Tr., 6/12/06, at 129; Knight Decl., Exh. 249, Kallas Dep. Exh. 17.) He advised that taking away

---

[27] Defendants object because the evidentiary material cited does not support this proposed finding of fact, and because the evidentiary material cited lacks sufficient foundation to support the propositions contained in this proposed finding. (DRPFOF ¶ 24.)

[28] Defendants do not dispute that DOC testified "for information only" of Act 105, and assert that it is rare that DOC "do it any other way." (Knight Decl., Exh. 227, Robert Margolies Dep. Tr. at 79-81.) (DRPFOF ¶ 25.)

hormones from inmates for whom they are medically necessary may cause those inmates to "become distressed or despondent; may go to point of clinical depression or an anxiety disorder, or suicidality; increase in staff time for mental health care, or placement on WRC; may lead to increase in disruptive behavior and segregation time; increase in psychotropic medication (Antidep) (offset any cost savings)." (Knight Decl., Exh. 215, Kallas Dep. Tr., 6/12/06, at 129; Knight Decl., Exh. 249, Kallas Dep. Exh. 17.) (PFOF ¶ 26.)

Dr. David Burnett, DOC Medical Director, testified in his June 12, 2006, deposition:

> A: Well, my opinion on Act 105 is a general one that I don't believe that medical care ought to be legislated and that medical care ought to be left to clinicians. I think it's bad public policy to get into legislating health care in terms of specifics like this.
> Q: When you say "like this," do you mean the prohibition of care to transgender inmates?
> A: Correct . . .

(Knight Decl., Exh. 222, Burnett Dep. Tr. at 90.) (PFOF ¶ 27.)

James Greer, Bureau Director for DOC Health Services, had the following deposition exchange:

> Q: Would you agree that this Act takes away the ability of the Department of Corrections' doctors to rely on their own medical judgment about providing hormones?
> A: Yes.
> Q: Can you tell me your views of the Act, its pros and cons?
> A: I guess the legislature – legislation basically takes away the autonomy of physicians to practice medicine to the best of their ability.
> Q: Do you think that's a good thing or a bad thing?
> A: I think it's a bad thing.
> Q: So in your view the medical judgment ought to remain within the doctors within the Department of Corrections?
> A: That's my opinion, yes.

(Knight Decl., Exh. 223, Greer Dep. Tr. at 33-34.) (PFOF ¶ 28.)

20

Dr. Stephen Hull was deposed on June 18, 2007, and said:

Q: Do you believe that Act 105 limits your ability to effectively treat GID?
A: Yes.

(Knight Decl., Exh. 224, Hull Dep. Tr. at 59.) (PFOF ¶ 29.)

The cost of providing hormone therapy is low, in absolute terms and in terms relative to the cost of providing medical treatment to address problems caused by untreated GID. The cost of sex reassignment surgery is no greater than several other surgical procedures provided to inmates.[29] (PFOF ¶ 30.)

Act 105 has prevented DOC from undertaking thorough evaluation of several inmates to determine what forms of GID treatment are medically necessary and appropriate for them, because such evaluations would be futile under Act 105.[30] (PFOF ¶ 31.)

DOC leadership rejects that notion that refusing to provide medically necessary treatment for inmates with GID increases prison security or saves money. In the deposition of Warden Judy Smith, taken on August 15, 2007, the following was stated:

Q: Do you think somebody being a transgendered prisoner makes them more likely to be the victim of sexual assault?
A: No.
Q: Do you think the fact that somebody is receiving hormone therapy makes them to be more likely to be a victim of sexual assault?
A: No.

---

[29] Defendants object to the statement, "[t]he cost of sex reassignment surgery is no greater than are several other surgical procedures provided to inmates" as not supported by the evidentiary materials cited. Defendants do not dispute that most expensive surgical procedures include organ transplants, such as liver, kidney and pancreas and open heart surgical procedures; that for a coronary bypass – paid $37,244.09; that for a kidney transplant – paid $32,897.00; and that genital reassignment surgery costs approximately $20,000. (DRPFOF ¶ 30.)

[30] Defendants object to the reference to "several inmates" in this proposed finding as not supported by the evidentiary materials cited. They do not dispute the two DOC inmates were not evaluated for hormone therapy given Act 105. (DRPFOF ¶ 31.)

Q: Do you think a prisoner's effeminate appearance or behavior might make them more likely to be a victim of sexual assault?
A: No.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 51.)

Q: Do you consider transgendered inmates to be particularly vulnerable?
A: No.
Q: Do you consider gay inmates to be particularly vulnerable?
A: No.
Q: Do you view transgendered inmates as being a higher security risk in any way?
A: No.
Q: What about gay prisoners?
A: No.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 44.)

Q: Are you aware of any situations in which you felt there was an aggressive prisoner – or prisoner who has a risk to be violent – where you felt that that prisoner was likely to target transgendered inmates?
A: No.
Q: Have you ever had a potentially aggressive prisoner that you thought only wanted to attack transgendered inmates?
A: No that I can recall.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 35.)[31]  (PFOF ¶ 32.)

In the deposition of Dr. David Burnett, DOC Medical Director, taken on June 12, 2006, the following was said:

Q: What I'm asking is whether you think that the Department of Corrections has any interests that are furthered by Act 105?
A: I guess, in my opinion, I don't see interests that are furthered by Act 105.

---

[31] Defendants object to the statement "DOC leadership rejects the notion that refusing to provide medically necessary treatment for inmates with GID increase prison security or saves money" as not supported by the evidentiary material cited and that the evidentiary material cited lacks sufficient foundation to support this assertion.  They do not dispute that this proposed finding contains accurate excerpts from Smith's deposition testimony.  (DRPFOF ¶ 32.)

22

(Knight Decl., Exh. 222, Burnett. Tr. at 98.) (PFOF ¶ 33.)

The plaintiffs have been in general population for the bulk of their sentences to date.[32] (PFOF ¶ 34.) OCI Warden Judy Smith testified that, during her almost eleven years as warden at OCI, she knows of no substantiated allegations of inmate-on-inmate sexual violence.[33] (PFOF ¶ 35.) In the deposition of OCI Warden Judy Smith taken on August 15, 2007, the following was stated:

> Q: Do you do anything to identify prisoners who are more likely to be victims of violence by other prisoners?
>
> A: No.
>
> Q: I think when we were talking about identifying potentially violent prisoners, you gave a similar answer – that there's not really a formal process. Is there an informal process? I mean, is there observation – the observations of staff about individual inmates – would that potentially go into a determination that somebody is more at risk of being a victim of violence?
>
> A: I think as I answered previously, I expect that staff look at everyone and be looking for signs that an inmate might be victimized – might be assaulted. You know, whichever way that it is, staff are expected to do continual daily observations. And when something – we're seeing any kind of an adjustment issue or an inmate that is not coping well for whatever reason, then we will take steps to address that.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 39.)

> Q: Are you aware of any situations in which a prisoner has been identified as potentially more assaultive than the average prisoner and something was done as a result of that?

---

[32] Defendants do not dispute that plaintiff Sundstrom was in general population for the bulk of her DOC prison sentence, but object to the remainder of this proposed finding as not supported by the evidentiary materials cited. (DRPFOF ¶ 34.)

[33] Defendants object to this proposed finding because it is not supported by the evidentiary material cited. Smith testified that she does not recall any instances of prisoner-on-prisoner sexual violence at OSCI, but that she does recall investigations for this type of activity. (DRPFOF ¶ 35.)

A: Yes.

Q: Can you explain – describe that situation?

A: I can recall a situation where an inmate arrived that had – was known to staff, and was brought to the supervisor's attention. And, you know, we did a little closer monitoring of that particular inmate.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 30.)

A: If we separate an inmate from another, I just place that inmate in a different housing unit. There's not generally a cost associated with that.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 37.) (PFOF ¶ 36.)

Other vulnerable inmates are provided with medically necessary care that creates even greater security concerns than the feminization due to hormones.[34] (PFOF ¶ 37.) There are no additional security costs associated with protecting prisoners with GID from violence. As Warden Judy Smith testified on August 15, 2007:

Q: Okay. Are you able to identify any costs associated with protecting inmates with gender identity disorder from violence?
A: I – no.
Q: So there are no costs that you're aware of?
A: I'm not aware of any.

(Knight Decl., Exh. 225, Smith Dep. Tr. at 57.)

Q: Has having transgendered prisoners at Oshkosh made any difference in terms of how you staff units in which they're living?
A: No.
Q: Have you ever had to ask for additional staff because of the presence of transgendered inmates?
A: No.

---

[34] Defendants object to this proposed finding because it is not supported by the evidentiary material cited. (DRPFOF ¶ 37.)

24

(Knight Decl, Exh. 225, Smith Dep. Tr. at 49.)[35]  (PFOF ¶ 38.)

Vankemah Moaton

DOC's own medical personnel have diagnosed plaintiff Vankemah Moaton with GID and have prescribed hormone therapy for Moaton repeatedly.[36]  (PFOF ¶ 39.)  Dr. Randi Ettner, an expert in GID diagnosis and treatment, has confirmed that Moaton has GID, that hormones are medically necessary for Moaton, and that termination of Moaton's hormones would have devastating and potentially life-threatening consequences.[37]  (PFOF ¶ 40.) Defendants' expert in another pending case involving a transgender inmate in Wisconsin concluded that termination of hormones for someone already taking them is "cruel and clinically inappropriate."[38]  (PFOF ¶ 41.)

Dr. Daniel Claiborn

Defendants' psychology expert, Daniel Claiborn, testified that no one has a medical need for hormone therapy or sex reassignment surgery, because GID is not a valid psychiatric diagnosis and, even if it were, no treatment for it would be medically necessary. In the deposition of Dr. Claiborn taken on June 12, 2007, the following was said:

_____

[35] Defendants do not dispute these are accurate excerpts from Smith's deposition testimony, however, objects to the statement "[t]here are no additional security costs associated with protecting prisoners with GID from violence" because the evidentiary material cited lacks sufficient foundation to support this broad assertion.  While this may be the case at OSCI and Warden Smith's experience, she never testified as to the experiences of GID inmates in other facilities with other security levels, security classifications, and/or different classifications of inmates.  (DRPFOF ¶ 38.)

[36] Defendants do not dispute, but assert that hormone therapy is not medically necessary treatment.  (DRPFOF ¶ 39.)

[37] Defendants do not dispute that this is Dr. Ettner's opinion, but dispute the accuracy of those opinions.  (DRPFOF ¶ 40.)

[38] Defendants do not dispute that this was the opinion of Cynthia S. Osborne, MSW, in another case, but dispute the accuracy of that opinion.  (DRPFOF ¶ 41.)

25

Q: Who hired you in this case?
A: The State of Wisconsin.
Q: Who contacted you first?
A: Jody Schmelzer.
Q: And what did Jody ask you to do?
A: She asked me to review the records on – with regard to these plaintiffs, and offer opinions not so much about these particular plaintiffs, but about the issues having to do with medical necessity and requirement to treat gender identity disorder as a mental illness.

(Knight Decl., Exh. 231, Claiborn Dep. Tr. at 11.)

A: . . . The opinions I outline in my report are: One, that I don't believe gender identity disorder is a mental disorder or a mental illness. And, secondly, that since it isn't a mental disorder or mental illness, I don't believe that medical treatment is a requirement for people who find themselves in that situation. The third opinion would be that I don't believe that the DSM and the process behind that is scientific or authoritative in the strictest scientific sense in terms of outlining and defining mental disorders. I think those are the primary ones.

(Knight Decl., Exh. 231, Claiborn Dep. Tr. at 13-14.)

Q: Do you think transgender people who have taken hormone therapy for years have a medical need for those hormones?
A: No.
Q: Why not?
A: Well, I'm not – I don't know – I'm not a medical doctor, and I don't know the physiology of how their bodies are functioning. But speaking in terms of treatment for a disorder, I don't think that they would have a need to start. It's an option, and it's something that they make a decision about continuing to use with the advice of their doctors in terms of the physical effects, but I'm not speaking as an M.D.

(Knight Decl., Exh. 231, Claiborn Dep. Tr. at 226-27.)  (PFOF ¶ 42.)

Dr. Claiborn disclaimed any opinion about the validity of any particular plaintiff's diagnosis or need for treatment:

Q: Turning to page 3 of the report, at the top you have a note about plaintiffs Moatan [sic] and Davison. Have you reviewed any records for either Moatan or Davison?

A: No.

Q: And you write, "It is not expected that reviewing their records will change any of the opinions contained herein." Did I read that correctly?

A: Yes.

Q: Why do you not expect, or why did you not expect that reviewing their records would change your opinions?

A: Because my opinions are more general about the issue of diagnosing transgender situations as mental disorders, not so much specifically about the particulars of the plaintiffs in the case.

Q: So in the records of the three plaintiffs that you did review, did you see anything in those records that affected your opinion in this case?

A: I didn't see anything in the records that directly affected my opinion about the general issue of whether transgender situations are mental disorders.

Q: So is it accurate to say that your review of the plaintiffs' records did not affect your opinion about whether GID is a mental disorder?

A: Yes.

(Knight Decl., Exh. 231, Claiborn Dep. Tr. at 18-19.)

Q: Did you form any opinions about the diagnoses of the plaintiffs?

A: I observed in the records what their diagnoses have been, but I didn't independently render a diagnosis on these three plaintiffs.

Q: Did you ask to meet with the plaintiffs?

A: No.

Q: Did you form an opinion based on your review of their records as to whether they had diagnoses of GID?

A: Yes.

Q: What was you opinion?

A: It seems as though each one of them has been diagnosed GID.

Q: And were you able to evaluate or discern whether you agree with that diagnosis?

A: I didn't actually critically examine it. I took it for granted that those diagnoses were warranted.

(Knight Decl., Exh. 231, Claiborn Dep. Tr. at 20-21.)[39]  (PFOF ¶ 43.)

Kari Sundstrom and Lindsey Blackwell

Kari Sundstrom has been released from prison, but remains on extended supervision.  (PFOF ¶ 44.)  The DOC directory, Vinelink, lists Sundstrom as having "absconded."[40]  (PFOF ¶ 45.)  On April 20, 2007, a criminal complaint against Sundstrom was filed in Dane County Circuit Court.  (PFOF ¶ 46.)  Consequently, a felony warrant issued the same day.  Lindsey Blackwell has been released from prison, but remains on extended supervision.  (PFOF ¶ 47.)

## ANALYSIS

The defendants contend that, 1) summary judgment is proper on the plaintiffs' facial challenge to the Inmate Sex Change Prevention Act because the Act is not unconstitutional in all applications; 2) plaintiffs Sundstrom and Blackwell should be dismissed inasmuch as the only relief requested is injunctive and declaratory relief; these plaintiffs are no longer in prison; and none of the incarcerated plaintiffs is housed at Racine Correctional Institution; and 3) plaintiffs cannot prevail on their equal protection claim because the Inmate Sex Change Prevention Act is rationally related to DOC's legitimate penological goals of safety and security.[41]

---

[39] Defendants dispute the statement that Dr. Claiborn "disclaimed any opinion about the validity of any particular plaintiffs ... need for treatment."  (DRPFOF ¶ 43.)

[40] Defendants do not dispute, for the purposes of summary judgment only.  (DRPFOF ¶ 45.)

[41] In their brief-in-chief, the defendants also argued that summary judgment was proper on plaintiff Moaton's as-applied challenge to the Inmate Sex Change Prevention Act because no admissible expert testimony supported that hormone therapy was medically necessary to treat plaintiff Moaton's gender identity disorder.  However, subsequently  plaintiff Moaton agreed to waive the Fifth Amendment privilege and answer questions concerning prior use (and possible withdrawal) of hormone therapy, along with prior feminizing procedures that had been done.  Given this stipulation, the defendants withdrew their motion for summary judgment on plaintiff Moaton's as-applied challenge to Wis. Stat. § 302.286(5m).  (Defs.' Reply Br. at 1.)

In response, plaintiffs first contend that there are disputed facts material to whether Act 105 is facially unconstitutional. They argue that Act 105 applies only when it bars doctors from prescribing medically necessary health care, and that it categorically prevents DOC medical providers from exercising their medical judgment to provide medically necessary treatment. Second, plaintiffs contend that plaintiffs Sundstrom and Blackwell's claims for declaratory injunctive relief are not moot. Third, plaintiffs submit that there is a genuine dispute of fact whether Act 105 violates the Equal Protection Clause of the Fourteenth Amendment, and that their evidence shows that Act 105 intentionally discriminates between similarly situated classes. Also, plaintiffs assert their evidence shows that Act 105 cannot withstand the constitutionally-mandated level of scrutiny because it is not justified by defendants' interest in maintaining prison security. Specifically, plaintiffs argue that their evidence shows that Act 105 does not rationally further defendants' interest in maintaining prison security; that their evidence shows that prisoners have no alternative means of accessing the medical treatment at issue; that their evidence shows that accessing hormones and surgery has no significant impact on prison guards or other prisoners, or the allocation of prison resources; and that their evidence shows that Act 105 is an exaggerated response to defendants' prison security concern.

**1. Facial Challenge to the Inmate Sex Change Prevention Act**

The defendants contend that plaintiffs' facial challenge to the Act cannot succeed because the Act is not unconstitutional in all applications. According to the defendants, the Act does not apply to all inmates, because not all inmates have gender issues. For those inmates who do not have a medical need for those procedures because

29

they do not have gender issues, the Act does not run afoul of the Eighth Amendment. The defendants assert:

> Clearly, the Act is not unconstitutional in all applications. In fact, the plaintiffs have, at best, only presented evidence that of the over 20,000 inmates it covers, the Act may only run afoul of the constitution as it applies to seven (7) individual inmates' need for hormones, . . . (2) two of which [sic] the Act no longer effects . . .

(Defs. Br. in Support of Mot. for Summ. J. at 9) (internal citations omitted).

The plaintiffs contend that disputed facts material to whether the Act is facially unconstitutional preclude granting summary judgment on the facial challenge. According to the plaintiffs, the Act "applies" only when it bars doctors from prescribing medically necessary health care; it does not "apply" to all DOC inmates.

> Supreme Court precedent makes clear that only the *relevant* applications are to be considered, rejecting states' attempts to defend legislation by pointing to the fact that some members of the general public remain unaffected. The Act is unconstitutional in all of its applications because the Act applies only where it makes a difference by actually preventing a DOC doctor from following her own medical judgment and providing medically necessary care. All of those applications violate the Eighth Amendment and the Equal Protection Clause.

(Pls.' Resp. Br. at 6-7.) The plaintiffs offer that there is a dispute over whether the medical care prohibited by the Act is necessary to meet a serious medical need.

In reply, the defendants assert that assuming, *arguendo*, the appropriate class is limited to those inmates who desire hormone therapy and/or sexual reassignment surgery and whose physicians would otherwise prescribe those treatments, plaintiffs cannot show that there is no set of circumstances under which the Act could be applied constitutionally.

> Thus, even for inmates who are diagnosed with GID, and even for those whose physician might otherwise prescribe

hormonal and surgical procedures as treatment for their GID, there is no violation for Eighth Amendment purposes where prison policy or statute forbids those treatments, as long as the physician evaluates serious medical needs and prescribes an alternate treatment to address the inmate's symptoms.

Here, the plaintiffs could prevail on their facial challenge only if they showed that, for every inmate seeking hormone therapy or surgery, only those treatments – not the myriad of treatments that remain available to inmates – could provide even palliative care. The case law forecloses that claim, and the plaintiffs do not even assert it.

(Defs.' Reply Br. at 3.)

The plaintiffs filed a surreply[42] in which they contend that defendants' argument that the Act has constitutional applications "is simply incorrect as a matter of law." (Pls.' Surreply at 2.) Plaintiffs go on state:

Plaintiffs have never claimed that they are entitled to hormone therapy or SRS because they "desire" or "choose" it. Nor do they claim it because an outside medical expert believes that the treatment is medically necessary. Instead, they claim that they have a right to the medically necessary care to treat their serious GID, *as determined by DOC health care professionals* in the exercise of their medical judgment. The problem with Act 105 is that it deprives Plaintiffs of medical care that *DOC medical personnel* believe is medically necessary for them. In the case of all of the current Plaintiffs, the undisputed medical judgment of their DOC care providers is that hormone therapy is medically necessary treatment. Defendants' medical personnel will decide that hormone therapy and possibly even surgery in some rare cases are medically necessary for inmates in the future, but Act 105 will impermissibly prevent them from providing it. Each such instance constitutes an application of Act 105.

...

---

[42] On September 27, 2007, the plaintiffs filed Plaintiffs' Motion for Leave to File Surreply Brief in Opposition to Defendants' Motion for Summary Judgment. They seek leave to file a surreply addressing arguments raised for the first time in the defendants' reply. Plaintiffs' motion, which is unopposed, will be granted.

Defendants also argue for the first time that, as long as they provide *some* treatment for prisoners' GID, they have satisfied the Eighth Amendment, even if they do not provide the hormone therapy or SRS that DOC medical staff have prescribed as medically necessary. Reply Br. at 3. This is simply a misstatement of law. If a treatment is necessary to treat a medical condition, a defendant cannot escape Eighth Amendment liability by providing plainly ineffective alternative treatments. *See, e.g., Edwards*, 478 F.3d at 831 (7th Cir. 2007) ("a plaintiff's receipt of *some* medical care does not automatically defeat a claim of deliberate indifference," if fact-finder could determine treatment was "blatantly inappropriate"); *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (Eighth Amendment plaintiff need not prove a "complete failure to treat"); *Harrison v. Barkely*, 219 F.3d 132, 138 (2d Cir. 2000) ("Even if prison officials give inmates access to treatment, they may still be deliberately indifferent to inmates' needs if they fail to provide prescribed treatment"). Again, if some hypothetical prisoners with GID could be effectively treated, in the medical judgment of DOC medical staff, without hormone therapy or SRS (perhaps with psychotherapy alone), the Act would not "apply" to them, because it imposes no restriction on their right to treatment for a serious medical need. However, for Plaintiffs, and for other prisoners for whom hormone therapy and surgery would be prescribed as medically necessary but for Act 105, the Act is unconstitutional in all of its applications.

(Surreply at 2, 4.)

Wisconsin Statute § 302.386 provides in relevant part:

(5m)(a) In this subsection:

1. "Hormonal therapy" means the use of hormones to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender.
2. "Sexual reassignment surgery" means surgical procedures to alter a person's physical appearance so that the person appears more like the opposite gender.
(b) The department may not authorize the payment of any funds or the use of any resources of this state or the payment of any federal funds passing through the state treasury to provide or to facilitate the provision of hormonal therapy or sexual

32

reassignment surgery for a resident or patient specified in sub. (1).

Wis. Stat. § 302.386(5m).

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 746 (1987). In *Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833 (1992), the Court described the appropriate class for the purpose of determining the validity of an abortion statute:

> Respondents attempt to avoid the conclusion that § 3209 is invalid by pointing out that it imposes almost no burden at all for the vast majority of women seeking abortions. They begin by noting that only about 20 percent of the women who obtain abortions are married. They then note that of these women about 95 percent notify their husbands of their own volition. Thus, respondents argue, the effects of § 3209 are felt by only one percent of the women who obtain abortions. Respondents argue that since some of these women will be able to notify their husbands without adverse consequences or will qualify for one of the exceptions, the statute affects fewer than one percent of women seeking abortions. For this reason, it is asserted, that statute cannot be invalid on its face. See Brief for Respondents 83-86. We disagree with respondents' basic method of analysis.

> The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. For example, we would not say that a law which requires a newspaper to print a candidate's reply to an unfavorable editorial is valid on its face because most newspapers would adopt the policy even absent the law. *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974). The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.

Respondents' argument itself gives implicit recognition to this principle, at one of its critical points. Respondents speak of the one percent of women seeking abortions who are married and would choose not to notify their husbands of their plans. By selecting as the controlling class women who wish to obtain abortions, rather than all women or all pregnant women, respondents in effect concede that § 3209 must be judged by reference to those for whom it is an actual rather than an irrelevant restriction. Of course, as we have said, § 3209's real target is narrower even than the class of women seeking abortions identified by the State: it is married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement. The unfortunate yet persisting conditions we document above will mean that in a large fraction of the cases in which § 3209 is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid.

*Id.* at 894-895; *see also Gonzales v. Carhart*, 127 S. Ct. 1610, 1639 (2007) (holding that Partial Birth Abortion Act of 2003's ban "applies to all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications").

The case law indicates that the controlling class is determined by whom the Act applies to. In this case, the Act applies when it bars doctors from prescribing health care that they have determined to be medically necessary. Thus, according to plaintiffs, the Act is unconstitutional in all applications. However, defendants contend that the Act is not unconstitutional in all instances because DOC doctors could prescribe some other form of treatment. Under these circumstances, according to the defendants, an inmate would be receiving "some treatment" and thus there would be no Eighth Amendment violation.

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his or her medical need was objectively serious; and (2) that the official acted with

deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Factors that indicate a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez*, 111 F.3d at 1373 (citations omitted). A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or in the unnecessary infliction of pain. *See Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999); *Gutierrez*, 111 F.3d at 1371.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chi.*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence

35

"that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (citing *Farmer*, 511 U.S. at 840-42).

Mere differences of opinion among medical personnel regarding a plaintiff's appropriate treatment do not give rise to deliberate indifference. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). However, deliberate indifference may be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.*; *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (citing as examples "the leg is broken, so it must be set; the person is not breathing, so CPR must be administered").

"[T]o prevail on an Eighth Amendment claim 'a prisoner is not required to show that he was literally ignored.'" *Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). A defendant's contention that a medical care claim fails because the prisoner "received some treatment overlooks the possibility that the treatment [the prisoner] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted)).

In this case, DOC doctors have determined that hormone therapy is medically necessary to treat the plaintiffs' GID. However, the parties disagree whether the medical treatments proscribed by the Act, hormone therapy and sex reassignment surgery, are ever medically necessary treatments for inmates with GID. If such treatments are medically necessary when doctors say that they are, and if prisoners do not receive the medically

36

necessary treatment because of the Act, plaintiffs argue that the denial would violate the Eighth Amendment.

The parties agree that there are a variety of therapeutic options for persons with GID. (DFOF ¶ 13.) However, as plaintiffs point out (and as defendants dispute), that does not mean that the treatments proscribed by the Act are not medically necessary for some individuals with GID. Interfering with a doctor's determination of "medical necessity" is serious; it may qualify as treatment "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno*, 414 F.3d at 654 (citation omitted). At this stage, the court cannot conclude that the Act is not invalid on its face. Thus, the defendants' motion for summary judgment as to this issue will be denied.

## 2. Plaintiffs Kari Sundstrom and Lindsey Blackwell

The defendants contend that plaintiffs Sundstrom and Blackwell should be dismissed because the only relief is injunctive and declaratory relief and because they are no longer in prison. Moreover, the defendants maintain that because plaintiff Blackwell was the only plaintiff in this suit residing at Racine Correctional Institution, defendants Humphreys and Nygren should be dismissed from this case.

The plaintiffs do not oppose the dismissal of defendants Humphreys and Nygren, but reserve the right to seek amendment of the pleadings should a plaintiff be assigned to Racine Correctional Institution prior to judgment. Regardless, the plaintiffs assert that plaintiffs Sundstrom and Blackwell's claims for declaratory and injunctive relief are not moot because there is a reasonable likelihood that one or both of them might return to prison.

To invoke Article III jurisdiction, a plaintiff seeking injunctive relief must show immediate, personal danger of sustaining direct injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). In *Knox v. McGinnis*, 998 F.2d 1405, 1413-15 (7th Cir. 1993), the court held that a prisoner lacked standing to seek injunctive relief against the future use of a "black box" on prisoners in segregation because he had been released from segregation and had returned to the general prison population where he was no longer subjected to the use of the "black box." In reaching its decision, the court relied upon *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) and *O'Shea v. Littleton*, 414 U.S. 488 (1974).

In *Lyons*, the plaintiff sued the City of Los Angeles and several police officers, alleging that the officers stopped him for a routine traffic violation and applied a choke hold without provocation. The plaintiff sought an injunction against future use of the choke hold unless the suspect threatened deadly force. The Supreme Court held that the plaintiff lacked standing to seek injunctive relief because he could not show a real or immediate threat of future harm. *Lyons*, 461 U.S. at 105. The Court relied upon its earlier decision in *O'Shea* in which it stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief...if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495-96. In *O'Shea*, the plaintiffs had alleged discriminatory enforcement of criminal laws. The Court held that there was no case and controversy because "the threat to plaintiffs was not 'sufficiently real and immediate.'" *Id.* at 496-497. Similarly, in *Lyons*, the Court found that, although an allegation of an earlier choking was sufficient to confer standing for a damage claim, it did "nothing to establish a real and immediate threat" that the plaintiff would again be stopped for a traffic violation and a choke hold put on him. *Lyons*, 461 U.S. at 105.

In the instant case, plaintiffs Sundstrom and Blackwell cannot establish a real and immediate threat that they again will be incarcerated in a DOC institution. The mere possibility that plaintiffs Sundstrom and Blackwell may again be incarcerated in a DOC institution is too speculative and does not establish a real and immediate case or controversy. *Knox*, 998 F.2d at 1413-14; *see also Robinson v. City of Chi.*, 868 F.2d 959 (7th Cir. 1989). In light of the foregoing, plaintiffs Sundstrom and Blackwell lack standing to pursue their claims for injunctive relief. Therefore, they will be dismissed from this action. Defendants Humphreys and Nygren will be dismissed as well.

### 3. Equal Protection Claim

The defendants contend that the Act is rationally related to DOC's legitimate penological goals of safety and security and that they are entitled to summary judgment dismissing the plaintiffs' equal protection claim. According to the defendants, "[i]t is undisputed that denial of hormone therapy and sex reassignment surgeries is rationally related to prison safety and security." (Defs. Br. in Support of Mot. for Summ. J. at 16.)

> In this case, it is undisputed that limiting prisoners' access to hormone therapy and sexual reassignment surgery makes them less effeminate, and as a result, less likely that they will be victimized by other inmates. DOC has an undisputable security interest in preventing these types of assaults. As this is a 'conceivable state of facts' that provides a rational basis for state action, the defendants are entitled to summary judgment on plaintiffs' equal protection claim.

*Id.* at 17.

Plaintiffs counter that there is a genuine dispute of fact whether the Act violates the Equal Protection Clause. According to the plaintiffs, their evidence shows that the Act intentionally discriminates between similarly situated classes. In addition, plaintiffs contend

39

that their evidence shows that the Act cannot withstand the constitutionally-mandated level of scrutiny. Plaintiffs point to the standard of review set forth in *Turner v. Safley*, 482 U.S. 78 (1987), and conclude that "[b]ecause Plaintiffs' evidence shows that Act 105 cannot withstand the *Turner* standard, there are genuine disputes of material fact that preclude summary judgment on plaintiffs' equal protection claim." (Pls.' Resp. at 20.) Plaintiffs assert that their evidence shows that Act 105 is not justified by defendants' interest in maintaining prison security because it is not reasonably related to it. Furthermore, plaintiffs contend that Act 105 cannot withstand even rational basis review.

Recently, the Seventh Circuit Court of Appeals reiterated the standard to be applied in equal protection cases where no fundamental right or suspect classification is at issue.

> The purpose of the Equal Protection Clause of the Fourteenth Amendment is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill of Willowbrok v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota County, Neb.*, 260 U.S. 441, 445, 43 S. Ct. 190, 67 L. Ed. 340 (1923)); *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713-14 (7th Cir. 2002). Where (as here) no fundamental right or suspect classification is at issue, equal protection claims are evaluated under the rational-basis standard of review. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003); *Martin*, 295 F.3d at 712; *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007-08 (7th Cir. 2000). To prevail, a plaintiff must prove the following: (1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest. *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002); *Discovery House*, 319 F.3d at 282.

*Smith v. City of Chi.*, 457 F.3d 643, 650-51 (7th Cir. 2006).  Thus, the court applies rational basis review to plaintiffs' equal protection claim.

The defendants argue that Act 105 is rationally related to the legitimate penological interests of safety and security.  *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993) (Under rational basis review, there is no constitutional violation if "any reasonably conceivable state of facts" would provide a rational basis for government action).

It is undisputed that denial of hormonal therapy and sex reassignment surgeries is rationally related to prison safety and security.  Even Plaintiffs' prison security expert, Walter L. Kautzky, acknowledged that "Gender Identity Disorder and the presentation of effeminate characteristics create challenges in a prison system" (DFOF ¶ 27), and there is no question that the intent of hormone therapy and sexual reassignment surgery is to increase the presentation of feminine characteristics. See, Wis. Stat. § 302.386(5m)(a)(1). Kautzky also concedes that inmates who display effeminate characteristics are viewed as sexually available, which increases the possibility that the prisoner may be sexually assaulted by other prisoners (DFOF ¶ 28).  There is no dispute that male inmates who appear more feminine are at an increased risk of victimization (DFOF ¶ 30).  According to Kautzky, inmates presenting themselves as highly effeminate in a male prison present additional security concerns (DFOF ¶ 29). Kautzky also agrees that institutions should not create conditions that would make inmates more vulnerable to assault. (DFOF ¶ 31).

Plaintiff Matthew Davison, unfortunately, has first-hand knowledge of the effects his hormone therapy has upon his safety in prison.  Davison was both raped and molested while in prison, and is constantly harassed by other inmates.  (DFOF ¶¶ 32, 33). Davison agrees that he is more of a target for this type of aggression by other male inmates because of the physical effects his body has seen on hormone therapy.  (DFOF ¶ 32).

The crux of Kautzky's report is an attempt to mitigate the difficulty posed by inmates who use hormones to increase their femininity by comparing them to other inmates who pose difficulties, such as inmate who have HIV or are mentally ill. However, the fact that other inmates pose security difficulties in

41

the prison has no bearing on whether the legislature had a rational basis for passing Wis. Stat. § 302.386(5m). The legislature need not "strike at all evils at the same time or in the same way." *Sutker v. Illinois State Dental Soc.*, 808 F.2d 632, 635 (7th Cir. 1986) (citing *Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 610 (1935)). It is sufficient that there is a problem "at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 487-88 (1955). In this case, it is undisputed that limiting prisoners' access to hormone therapy and sexual reassignment surgery makes them less effeminate, and as a result, less likely that they will be victimized by other inmates. DOC has an undisputable security interest in preventing these types of assaults. As this is a "conceivable state of facts" that provides a rational basis for state action, the defendants are entitled to summary judgment on plaintiff's equal protection claim.

(Defs.' Br. in Support of Mot. for Summ. J. at 16-17.)

There is no dispute that prison safety and security are legitimate penological interests. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (1993) (describing "internal security" as "perhaps the most legitimate of penological goals). However, according to the plaintiffs, their evidence shows that Act 105 does not rationally further defendants' interest in maintaining prison security.

Even if transsexual prisoners who present femininely are at risk of assault at the hands of male prisoners, Plaintiffs' evidence shows that denying the medical treatment at issue does not rationally further Defendants' interest in mitigating the risk of assault. By definition, male-to-female transsexuals experience a persistent discomfort with their assigned male sex and a strong female gender identity. (PFOF ¶¶ 2-4.) To alleviate the psychological distress or impairment caused by their GID, many such individuals whose gender identity is female express it through their appearance, mannerism, name and pronoun choices, or by otherwise identifying and expressing themselves as women. (PFOF ¶ 6.) Significantly, many seek to do so even absent surgery or hormone therapy. (PFOF ¶ ¶ 6, 18.) Thus, even without the medical treatments at issue, many male-to-female transsexual prisoners will still identify or present

42

themselves femininely, and therefore will still be at risk of assault at the hands of male prisoners. Defendants' mischaracterization of Plaintiffs' expert's testimony does not change the analysis. The relevant inquiry is not whether transsexual prisoners who present femininely are at risk of assault, but rather whether denying hormones or surgery mitigates any such risk. Because denying Plaintiffs hormones or surgery does not reduce any risk of assault, it does not rationally further Defendants' interest in mitigating the risk of assault.

(Pls.' Resp. at 22.)

Based on the foregoing, the court finds that there is a genuine dispute of material fact concerning whether Act 105 is rationally related to prison safety and security. Thus, defendants' motion for summary judgment on plaintiffs' equal protection claim will be denied.

Now, therefore,

**IT IS ORDERED** that the defendants' motion for partial summary judgment (Doc. #120) is **GRANTED IN PART AND DENIED IN PART** as described herein.

**IT IS FURTHER ORDERED** that defendants Robert Humphrey and Susan Nygren are **DISMISSED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file surreply brief (Doc. #163) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file surreply brief (Doc. #163) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 15th day of October, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE