UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ANDREA FIELDS,
MATTHEW DAVISON, also known as Jessica Davison,
and VANKEMAH D. MOATON,

                    Plaintiffs,

          v.                                    Case No. 06-C-112

WARDEN JUDY P. SMITH,
THOMAS EDWARDS,
JAMES GREER,
ROMAN KAPLAN, MD,
and RICHARD RAEMISCH,

                    Defendants.

## MEMORANDUM DECISION

Following a court trial, in March 31, 2010, this court entered an order

declaring Wis. Stat. § 302.386(5m) unconstitutional and enjoining the enforcement of the

statute. The following memorandum constitutes the court's findings of fact and conclusions

of law underlying that order in accordance with Federal Rule of Civil Procedure 52.

## BACKGROUND

Plaintiffs[1], who are Wisconsin prison inmates, bring this action under 42

U.S.C. § 1983 for declaratory and injunctive relief claiming that the defendants violated the

United States Constitution by enforcing 2005 Wisconsin Act 105, codified as Wis. Stat. §

302.386(5m) (Act 105), and abruptly terminating and depriving them of medical treatment

---

[1] On October 15, 2007, pursuant to the defendants' motion for partial summary judgment, former plaintiffs Kari Sundstrom and Lindsey Blackwell were dismissed from this case because their claims for injunctive and declaratory relief are moot as they are no longer in prison.

for their serious health condition, Gender Identity Disorder (GID). Further, plaintiffs assert that the defendants acted without exercising individualized medical judgment and in contrast to the treatment the defendants provide to similarly situated inmates in Wisconsin Department of Corrections (DOC) facilities. Consequently, plaintiffs ask this court to find that the defendants have violated their Fourteenth Amendment right to equal protection and their Eighth Amendment right to be free from cruel and unusual punishment. Moreover, they ask that Wis. Stat. § 302.386(5m) be declared unconstitutional on its face. During the pendency of this case, the DOC has provided hormone therapy to plaintiffs under the terms of a preliminary injunction.

## STIPULATED FACTS

Plaintiff Andrea Fields is a male-to-female transsexual in DOC custody at Green Bay Correctional Institution (GBCI). The DOC has diagnosed Fields with GID. Fields has received feminizing hormone therapy continuously since 1996. In 2003, Fields underwent breast augmentation as a component of gender transition. After becoming incarcerated in 2005, the DOC confirmed Fields's GID diagnosis and continued hormone therapy. In 2006, because of the passage of Act 105, the DOC began to taper Fields's hormone therapy by halving the dosage. As a result of the reduction, Fields experienced nausea, muscle weakness, loss of appetite, increased hair growth, skin bumps, and depression. The reinstatement of Fields's hormone therapy following the preliminary injunction in this action abated the withdrawal symptoms.

Plaintiff Matthew Davison, also known as Jessica Davison, is a male-to-female transsexual in DOC custody at Oshkosh Correctional Institution ("OSCI"). The DOC has diagnosed Davison with GID. Prior to receiving hormone therapy, Davison attempted

2

suicide by jumping off a roof. Davison was diagnosed with GID in 2005 and began hormone therapy as treatment for that condition shortly thereafter. The DOC has provided Davison with hormone therapy during incarceration. After arriving at Dodge Correctional Institution, the DOC began to withdraw Davison's hormone therapy because of Act 105. As a result of that withdrawal, Davison experienced increased and darker hair growth, voice deepening, breast reduction and leaking, mood swings, mental and emotional instability, hot flashes, and body aches. The reinstatement of Davison's hormone therapy because of the preliminary injunction in this action led to an abatement of withdrawal symptoms.

Plaintiff Vankemah Moaton is a male-to-female transsexual in DOC custody at Jackson Correctional Institution (JCI). The DOC has diagnosed Moaton with GID. Moaton has experienced suicidal ideation in the past, including after being removed from hormone therapy. Moaton began taking feminizing hormones in the late 1990s, took medically prescribed hormone therapy beginning in 2000, and has continued to receive that treatment during DOC incarceration. After entering DOC custody, the DOC began to withdraw Moaton's hormone therapy because of Act 105. As a result of that withdrawal, Moaton started growing chest and facial hair, developing tenderness in the chest and groin areas, and experiencing skin breakouts, hot flashes, and depression. The reinstatement of Moaton's hormone therapy because of the preliminary injunction in this action led to an abatement of withdrawal symptoms. All of plaintiffs have, to varying degrees, feminine physical characteristics as a result of their hormone usage.

Matthew J. Frank was, at the time this action was filed, the Secretary of the DOC. The current Secretary of the DOC is defendant Richard Raemisch. Defendant

James Greer is the Director of the DOC Bureau of Health Services. Defendant Judy P. Smith is the Warden at OSCI. Defendant Thomas Edwards was the Health Services Unit Manager of the OSCI Health Services Unit until May 11, 2007. That position is currently vacant.

GID is classified as a psychiatric disorder in the DSM-IV-TR, the current edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). GID has been included in the DSM since the third edition of that manual, which was published in 1980. In prior editions, the DSM classified "transsexualism" as a psychiatric disorder. The following diagnostic criteria are listed in the DSM for GID: 1) a strong and persistent cross-gender identification; 2) a persistent discomfort with one's sex or a sense of inappropriateness in the gender role of that sex; 3) the disturbance is not concurrent with a physical intersex condition; and 4) the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Matthew Davison, a/k/a Jessica Davison, has used a female name since childhood. Andrea Fields acted like a girl at school, talked like a girl, walked like a girl, wore makeup, and had a feminine hairstyle. Vankemah Moaton started behaving in a feminine manner prior to age eight.

Kenneth Krebs, a/k/a Karen Krebs, a male-to-female transsexual in DOC custody, cross-dressed as a child and adolescent. Erik Huelsbeck, a/k/a Erika Huelsbeck, another male-to-female transsexual held by the DOC, dressed as a girl for "dressed-up" day at school and other times, sometimes publicly.

DOC administrative personnel generally agree that deference on health care matters should be given to DOC health care staff. Sometimes the DOC prescribes

4

hormone therapy for reasons that do not have to do with GID, such as estrogen replacement therapy in postmenopausal years, or for inmates with a congenital or hormonal disorder that requires the administration of hormone therapy.

The legislative sponsors of Act 105 labeled it the "Inmate Sex Change Prevention Act." Act 105 provides:

SECTION 1. 302.386(5m) of the statutes is created to read:

302.386**(5m)** (a) In this subsection:

> 1. "Hormonal therapy" means the use of hormones to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender.

> 2. "Sexual reassignment surgery" means surgical procedures to alter a person's physical appearance so that the person appears more like the opposite gender.

(b) The department may not authorize the payment of any funds or the use of any resources of this state or the payment of any federal funds passing through the state treasury to provide or to facilitate the provision of hormonal therapy or sexual reassignment surgery for a resident or patient specified in sub. (1).

SECTION 2. Initial applicability.

(1) PROVISION OF HORMONAL THERAPY OR SEXUAL REASSIGNMENT THERAPY. This act first applies to hormonal therapy, as defined in section 302.386 (5m) (a) 1. of the statutes, as created by this act, or sexual reassignment surgery, as defined in section 302.386 (5m) (a) 2. of the statutes, as created by this act, provided on the effective date of this subsection.

(Ex. 24.)

5

The legislative sponsors issued multiple press releases prior to its passage stating that it was intended to prevent "bizarre taxpayer-funded sex change procedures" and to stop the DOC policy of "[allowing] pharmacists within the correction system to give hormones to an inmate diagnosed with gender identity disorder." The only correctional or medical expertise offered during the legislative hearings regarding Act 105 was that of defendants' correctional medical personnel, Dr. Kevin Kallas and Dr. David Burnett. No other DOC representative testified before the legislature regarding Act 105. No one other than legislators spoke in support of the bill that became Act 105. An earlier draft of Act 105 made explicit reference to GID, banning the use of DOC funds "to provide or facilitate the provision of hormonal therapy or sexual reassignment surgery for the treatment of gender identity disorder." Several of the press releases issued by the sponsors of Act 105 noted specifically that the issue of sex reassignment treatment for inmates came to light when they learned that a Wisconsin transgender inmate was receiving treatment that led her to develop "female characteristics, such as breasts."

While sex reassignment surgery is more expensive than hormone therapy, DOC provides surgeries of equal or greater cost, such as organ transplant and open heart surgical procedures, when medically necessary. Genital sex reassignment surgery costs approximately $20,000. The most expensive surgical procedures provided to inmates by defendants include organ transplants, such as liver, kidney and pancreas transplants, and open heart surgical procedures. In 2005, the defendants paid $37,244.09 for one coronary bypass surgery and $32,897.00 for one kidney transplant surgery. The Fiscal Estimate prepared for AB-184, the bill that became Act 105, noted that the defendants paid a total of $2,300 for cross-gender hormone therapy for two inmates with GID in 2004. Such

6

hormone therapy for inmates with GID costs defendants approximately $300 to $1,000 per inmate per year. A second-generation antipsychotic, Quetiapine, costs approximately $2,555 to $2,920 per inmate per year on average, and, in 2004, the defendants paid approximately $2.5 million for inmates to have Quetiapine. Another second-generation antipsychotic, Risperidone, costs approximately $2,555 per inmate per year on average.

Act 105 has prevented the DOC from undertaking thorough evaluations of at least two inmates to determine whether hormone therapy is medically necessary and appropriate for them. Erik Huelsbeck, a/k/a Erika Huelsbeck, was continuously in facilities administered by the DOC from December 2004 until July 2007, when Huelsbeck was transferred to the Wisconsin Resource Center. Huelsbeck was first diagnosed with GID by the DOC in 2006. Huelsbeck has not been evaluated to determine whether hormone therapy will be prescribed, nor could such treatment be prescribed, because of Act 105. Similarly, Krebs has been diagnosed with GID by the DOC. However, Krebs has not been evaluated to determine whether hormone therapy will be prescribed, nor could Krebs receive such treatment, because of Act 105.

Plaintiffs have been in DOC general population for most of their sentences. When OSCI identifies inmates who are more likely to be victims of violence by other prisoners, or more likely to perpetrate violence, it takes steps to address that through closer monitoring or placing the inmate in a different housing unit.

OSCI has eleven different housing units. One is a dormitory setting and houses 148 inmates. Two are wet cell units—they have toilet and shower facilities in the cell. The remaining nine have group bathrooms. The non-dormitory units have between 160-200 inmates each. The majority of the inmates in those units are double-celled.

7

The DOC does not permit inmates to pay for their own health care or to seek insurance coverage, as non-inmates could, so Act 105 bars the only avenue for inmates with GID to receive hormone therapy and/or sex reassignment surgery. Neither the DOC as a whole nor any of the defendants have had any involvement in the drafting of, or the introduction of, any of the bills that became Act 105.

EVIDENCE PRESENTED AT TRIAL

1. Witnesses

Plaintiffs' witness Dr. Randi Ettner is a clinical psychologist who received a Ph.D. in psychology in 1979. (Trial Tr. vol. 1, 13-14, Oct. 22, 2007; *see also* Ex. 525.) She has evaluated or treated between 2,500 and 3,000 clients with GID since 1976. (Trial Tr. vol. 1, 15, Oct. 22, 2007.) Dr. R. Ettner conducts independent research in the area of GID; has written three books, two of which are peer-reviewed; provides consultation to other mental health professionals; provides in-service or education to physicians, attorneys, and other groups; and collaborates with colleagues in organizations that treat individuals with GID. (*Id.* at 14, 16.) She is the editor of the International Journal of Transgenderism, which is published by Haworth Medical Press. (*Id.* at 17.) Dr. R. Ettner is a member of the scientific committee of the World Professional Association for Transgender Health ("WPATH")[2], known previously as the Harry Benjamin International Gender Dysphoria Association ("HBIGDA"). (*Id.* at 18.) Approximately 70% of her work time is spent seeing clients. (*Id.*) As part of her role as clinician for clients with GID, Dr. R. Ettner examines

---

[2] WPATH is an international organization of professionals, mainly medical people and attorneys, who work with and give services to individuals who have GID. (Trial Tr. vol. 1, 19, Oct. 22, 2007.) WPATH publishes the Standards of Care ("SOC") which, according to Dr. R. Ettner, is the worldwide acceptable protocol for treating GID. *Id.* at 19-20.

8

clients and recommends necessary medical treatments. (*Id.* at 22.) Her role is to collaborate with medical caregivers, endocrinologists, and surgeons who implement the treatments. (*Id.*) Dr. R. Ettner assesses the intensity of the GID in a given individual, and determines whether or not a particular treatment would be medically necessary. (*Id.*)

Plaintiffs' witness Dr. Frederic Ettner has been a family medicine physician for the past thirty years. (*Id.* at 83.) In approximately 1994, he started seeing patients with GID in his private practice. Since that time he has seen over 500 GID patients. (*Id.* at 88.) Dr. F. Ettner is a member of WPATH. (*Id.* at 91.) In 2007, Dr. F. Ettner presented a medical education seminar on family medicine and transgender at the WPATH international conference, which was held in Chicago. (*Id.* at 91-92.) Dr. F. Ettner addresses GID in his teaching as a clinical instructor for Northwestern University and the University of Southern California Medical Schools. (*Id.* at 92.) He considers himself an expert in transgender medicine. (*Id.* at 93.)

Vankemah Moaton, incarcerated at JCI, is one of the plaintiffs in this case. Moaton is a 29-year-old biological male who recalls feeling or acting in a feminine way as early as age four. (Trial Tr. vol. 2, 140, Oct. 23, 2007.) As Moaton got older, the feeling intensified, along with feelings of hatred for having a male body. (*Id.* at 140-41.) Moaton felt better when able to act like a girl, dress up in girl clothes, and play with dolls. (*Id.* at 142.) Moaton experienced anger and "lots of depression" as Moaton's body began developing as a man and self-hatred feelings intensified. (*Id.* at 142-43.) Moaton started taking female hormones around age seventeen or eighteen and as a result started seeing less facial hair growth and a skin "glow" and developed breasts. (*Id.* at 144.) These

changes made Moaton feel happier than ever before because steps were being taken toward becoming a woman. (*Id.* at 144-45.) A year or two after starting hormones, Moaton began dressing as a woman and living life as a female, including in a couple of jobs. (*Id.* at 146.) In addition, Moaton has had electrolysis on the face, as well as silicone injections in cheeks, chin, breasts, and hips. (*Id.* at 147.) Moaton considers Moaton to be a woman and is "completely detached" from the male part or male characteristics. (*Id.* at 148.) Moaton is currently taking feminizing hormones. (*Id.* at 154.)

Plaintiffs' witness Dr. Kevin Kallas is the Mental Health Director for the DOC. (*Id.* at 168.) He is board certified in general psychiatry and forensic psychiatry. (*Id.*) Dr. Kallas is responsible for informing the psychologists and psychiatrists within the DOC about the care of inmates with GID. (*Id.* at 173.) Dr. Kallas's responsibilities include clinical oversight of approximately thirty-five psychiatrists and approximately 100 psychology staff; development of policy for achieving consensus within the department as to what policies ought to be; clinical consultation to the psychologists and psychiatrists; formulating policy for psychotropic medications; and acting as a liaison to outside groups such as advocacy groups. (*Id.* at 196.) He sits on the DOC gender identity committee. (*Id.* at 170.) Dr. Kallas's prior experience in working with persons with GID includes five years at the San Francisco psychiatric emergency room where he saw about a dozen transgender patients, some on a recurring basis. (*Id.* at 171-72.) He also had at least one transgender patient while in private practice and, while working as a psychiatrist at Dodge Correctional Institution, evaluated and treated at least one patient with GID. (*Id.* at 172.)

Defendants' witness Dr. David Burnett is the Medical Director of the DOC. (*Id.* at 210.)  He has been licensed to practice medicine in Wisconsin since 1980 and is board certified in family medicine. (*Id.* at 211.)  Dr. Burnett also has a degree in Masters of Medical Management. (*Id.)*  His duties and responsibilities as DOC Medical Director include oversight for care within the Wisconsin prison system, including the primary care physicians; oversight to the mental health director; oversight to the dental area and the pharmacy; and review of medical policy.  (*Id.* at 212.)  Dr. Burnett is a member of the DOC gender identity disorder committee. (*Id.* at 223.)

Plaintiffs' witness Dr. George Brown is chief of psychiatry at the Mountain Home VA Medical Care Center in Johnson City, Tennessee, and Professor of Psychiatry at East Tennessee State University. (Trial Tr. vol. 3, 245, Oct. 24, 2007.)  He is board certified in psychiatry and licensed to practice psychiatry in Tennessee, Texas, and Ohio. (*Id.* at 246.)  Dr. Brown's specialized training in the field of GID includes pursuing such training with experts at the University of Rochester, Case Western Reserve University, and the Institute of Living in Hartford, Connecticut. (*Id.*)  He has published articles on GID and transgender issues in approximately twenty-six journals and has had about forty abstracts published from scientific meetings. (*Id.* at 246-47.)  Dr. Brown has published one scientific abstract on the issue of prison inmates with GID and currently has one paper being considered for publication. (*Id.* at 248.)   He has conducted research on "gender phenomenon" since the mid-1980s, some of which has been specific to GID and transsexualism, some on prison issues with GID, as well as a variety of other transgender phenomenon including transvestism. (*Id.* at 248-49.)  Dr. Brown has been involved in the

clinical evaluation of patients with GID for about twenty-six years and evaluated or treated more than 500 patients with gender identity concerns. (*Id.* at 249.) He is a member of WPATH and holds the position of secretary/treasurer for that organization. (*Id.*) Dr. Brown's correctional experience consists of working for one month as a staff psychiatrist in two maximum security prisons in Ohio and working for six months part-time in a forensic psychiatric facility for criminally insane inmates. (*Id.* at 250.) He has evaluated five prison inmates with GID. (*Id.* at 251.)

Defendants' witness Dr. Daniel Claiborn is a psychologist who has been licensed in Missouri and Kansas since 1980. (*Id.* at 335.) He holds a Ph.D. in counseling psychology. (*Id.* at 336.) He is a member of the American Psychological Association and is the chair of the ethics committee of the Kansas Psychological Association. (*Id.* at 339.) Dr. Claiborn has a psychotherapy practice which covers "all the dimensions of psychopathology, basically[,] including depression, anxiety, marital problems, relationship issues, and some unique categories like eating disorders." (*Id.* at 346.) He has a special niche working with gay and lesbian clients in his community and for the past twenty years has had a steady flow of those clients. (*Id.*) Since the early 1980's, Dr. Claiborn has had one to three transgender clients per year. (*Id.*) In his private practice he has had approximately fifty clients who suffer from GID or have transgender issues. (*Id.* at 347.) Dr. Claiborn is trained to treat mental disorders such as anxiety and depression. (*Id.* at 353-54.) Dr. Claiborn has been an expert witness in approximately sixty-six cases between 2004 and October 2006. (*Id.* at 378.) About 20% of his work consists of seeing patients

and 80% is consulting or expert witness work. (*Id.* at 379.)  Dr. Claiborn has not done any research on GID and has not published any articles or books on GID. (*Id.* at 379-80.)

Eugene E. Atherton is the defendants' security expert.  He is a retiree of the Colorado Department of Corrections, and also acts as a private consultant in criminal areas of criminal justice. (*Id.* at 406.)  He has worked in corrections since 1975. (*Id.*)  A good portion of Atherton's employment with the correctional system has focused on security issues, including as warden at medium and maximum security institutions, and assistant director of prison operations for the western region of the Colorado Department of Corrections. (*Id.* at 408.)  Since 2004, Atherton has worked as an expert witness in various cases.  He also published the only book on use of force in corrections.  *Id.* at 409.  He does technology work for the National Law Enforcement and National Technology Center out of Denver, on a national level, which requires him to communicate with a number of states and agencies on security and safety issues as they relate to technology. (*Id.* at 410.)  Atherton works approximately thirty hours per week, visits jails and prisons and interacts with staff, and is currently building an organization in the Rocky Mountain states for viewing and assessing technology among agencies, all related to safety and security.  (*Id.* at 410-11.)  Approximately once or twice a year, he gets called to the National Institute of Corrections as a subject matter expert on issues of security and safety.  (*Id.* at 411.)

## 2. Plaintiffs

According to Dr. R. Ettner, all three plaintiffs have severe GID.[3] (Trial Tr. vol. 1, 43, Oct. 22, 2007.) Dr. R. Ettner testified that, at a minimum, plaintiffs require hormone therapy to treat their severe GID. (*Id.*) Hormone therapy is medically necessary for the plaintiffs because nothing short of that treatment will provide an attenuation or relief from the severe distress caused by GID at that level. (*Id.* at 55.)

According to Dr. R. Ettner, plaintiff Fields looks like a woman, has large breasts, and is "very feminine in appearance." (*Id.* at 51.) The prison guards refer to Fields as "she, I mean he." (*Id.*) Fields "is fully feminine in her presentation and in her appearance." (*Id.*) Dr. R. Ettner testified:

> Andrea Fields is one of those individuals who thought she was a girl when she was growing up, and always behaved and lived as a girl. She never even tried to live as a boy. Even though, for instance, she was punished for playing with nail polish, she never ever attempted to be anything other than what she thought she was.

(*Id.*)

Dr. R. Ettner says Plaintiff Davison looked "fairly feminine" in appearance. (*Id.* at 52.) Davison had some breast growth and a female hairstyle, and attempted to present with female mannerisms. (*Id.*) As a result of using hormones for a period of time, Davison had some of the physical manifestations of female secondary sex characteristics, which come on with hormone usage. (*Id.*) Davison appeared to have other psychiatric disorders

---

[3] Dr. R. Ettner personally interviewed the three plaintiffs in this case, administered psychological testing, and reviewed medical records that she was provided with. (Trial Tr. vol. 1, 43, Oct. 22, 2007.) She met with each plaintiff for approximately three and a half hours. (*Id.* at 44.) Most of this section is taken from Dr. R. Ettner's testimony regarding her interviews of the plaintiffs. (*See id.* at 42-58.)

14

as well as GID. (*Id.*) Davison had previously sought treatment for depression, and Dr. R. Ettner believes that Davison had a personality disorder. (*Id.* at 53.) Davison sought treatment for GID at the Pathways Clinic in Milwaukee. (*Id.*) Davison made several suicide attempts in the past. (*Id.*) Davison is married to a woman and has two children. (*Id.* at 71.)

According to Dr. R. Ettner, plaintiff Vankemah Moaton is "a bona fide transsexual." (*Id.* at 54.) Prior to incarceration, Moaton was living and working as female and everyone, including family, regarded Moaton as a female. (*Id.*) Moaton looks like a female in that Moaton has female bone structure, a female hairstyle, a voice that is entirely female, a waist to hip ratio that appeared female, breast development, no facial or body hair, and a lack of the muscle mass that is characteristic of genetic males. (*Id.* at 58.) Moaton served in the Army Reserves from 1995 to 2003. (*Id.* at 71.)

### 3. Gender Identity Disorder[4]

#### a) Dr. R. Ettner

Dr. R. Ettner testified that GID is:

> a rare condition in which an individual has the persistent idea
> that they are or wish to be a member of the opposite sex, and
> the persistent feeling that their own body is inappropriate or
> wrong, and they desire to rid themselves of the characteristics
> of the sex they were born with and attain the characteristics of
> the other sex.

(Trial Tr. vol 1, 23, Oct. 22, 2007.) The criteria for the diagnosis is set out in two places, the International Classification of Disease ("ICD"), and the DSM. (*Id.* at 24-25.) The ICD and the DSM "are nomenclature, in one case of all medical and psychiatric disorders, and

---

[4] This section sets forth relevant testimony with respect to defining and diagnosing GID from witnesses Dr. R. Ettner, Dr. F. Ettner, Dr. Burnett, Dr. Brown, and Dr. Claiborn.

15

the other psychiatric disorders that mental health professionals need to familiarize themselves with and treat." (*Id*. at 25.) GID affects one in 11,900 genetic males. (*Id*.) The best way to diagnose it is "that they come in and tell us." (*Id*. at 24.) An individual will seek out a professional and relate a history of gender dysphoria or history of feeling trapped in the wrong body. (*Id*.) "And that's usually causing them distress, at least enough to bring them to a mental health professional." (*Id*.)

The intensity of the distress varies depending on the severity of the disorder. (*Id*.) "For some people the disorder is so intense and so severe, that they simply cannot function unless they do something to correct this disorder. For other people the discomfort is less intense, and they are able to manage the condition over a lifetime." (*Id*.) Taking a history of a client is important in diagnosing GID because the diagnosis is partially based on the duration of the symptoms and the feelings. (*Id*. at 26.)

Dr. R. Ettner's GID clients have some common characteristics:

People who have severe Gender Identity Disorder, what we refer to as transsexualism, will give a lifelong history, often beginning as early as three or four. Sometimes they say that they thought they were a girl until they realized at a later age they weren't.

They will describe a period of dressing or what we would call cross-dressing, dressing in the desired gender, often taking a mother or sister's clothes when they're young and wearing those.

Typically they have a dislike of their genitals. Puberty is a very difficult time for these individuals. And they will track along their lifeline various stigmata of gender confusion or gender disorder.

. . . .

16

They try to rid themselves of the secondary sex characteristics.

So a male will shave their body hair, oftentimes even before they know the name of this disorder or what it is that they're experiencing. They'll tuck their genitals. They will, you know, try to appear and be perceived as a member of the other sex, if not publicly for fear of being punished or shamed, at least privately when they feel safe they'll try to restore some sense that when they look in the mirror what they're seeing feels like who they really are.
. . . .

Even children, often very young, will show Gender Identity Disorder. They know nothing about hormones, they know nothing about surgery, but they believe that they are or they very much want to be a member of the other sex.

So, for instance, a young boy will put on a dress or nail polish. And oftentimes they're punished or shamed for doing that. They'll continue. They'll play mostly with girls when they have the opportunity. They won't like rough and tumble play.

(*Id.* at 26-27.)

According to Dr. R. Ettner, there is no definitive test to say whether someone

has GID. (*Id.* at 28.) However, there is no controversy over the existence of the disorder.

(*Id.* at 42.)

b) Dr. F. Ettner

Dr. F. Ettner testified that, based on his medical knowledge and experience

treating transgender patients, GID is a serious health condition. (*Id.* at 93.) He stated:

Those individuals, with Gender Identity Disorder who express dysphoria, not being in the right body, where the brain is not in concert with their physical appearance, will have a lot of dysfunction. Initially it may present as depression, lethargy, and they will then come to my attention. If not treated, whether it be by talk therapy and/or hormones, they can develop serious medical problems.

17

(*Id.* at 94.) The medical problems include further depression, morbid depression, and suicidal ideation. (*Id.*) A family physician may diagnose GID. (*Id.*) In practice, Dr. F. Ettner will consult with other experts, namely, gender therapists, psychologists, psychiatrists, or social workers to confirm his suspicions of GID. (*Id.* at 94-95.) GID varies in its severity and is a generally accepted medical condition. (*Id.* at 128.)

### c) Dr. Burnett

Dr. Burnett acknowledges GID as a serious health condition that requires evaluation and treatment. (Trial Tr. vol. 2, 227-28, Oct. 23, 2007.)

### d) Dr. Brown

Dr. Brown testified that once a person has reached the clinical significance threshold, by definition it becomes a clinical diagnosis that warrants medical attention. (Trial Tr. vol. 3, 259, Oct. 24, 2007.) Once the clinical threshold is reached, a person will have "significant symptomatology that in most cases warrants some type of individualized treatment." (*Id.*) There is no controversy among professionals who work in the GID field that it is a serious health condition. (*Id.* at 260.) On the other hand, there is the following controversy among professionals working in the field of GID:

> There are a lot of things that are in the DSM, a lot of diagnoses in the DSM that have substantial medical components. And again, there's no bright line in medicine between what's so-called medical and so-called psychiatric. And the DSM is very clear on that in the preamble, because there is substantial overlap in most of our conditions.
>
> So, there are some people who believe that because it's likely that there are biological underpinnings to Gender Identity Disorder that that's predominantly a medical disorder and, therefore, should be in the list of medical conditions or neurological conditions as opposed to a psychiatric condition.

18

But whether it exists at all and whether it's serious, those things are not controversial. It's a matter of placement.

(*Id.*)

The mental state of a person presenting with GID who is not receiving treatment varies:

Usually the people that make it to me through referral sources from all over the country, have at least moderate to severe form of the disorder.

And prior to receiving treatment they are very preoccupied with their condition, spend considerable amount of their time, effort, energy and resources trying to obtain treatment in the form of psychotherapy hormones, and in some cases ultimately sex reassignment surgery.

They uniformly have gender dysphoria which is not a diagnosis but an amalgam of symptoms that includes depression, anxiety and irritability mixed together.

Frequently they have suicidal ideation and have had suicide attempts in the past.

They often harbor thoughts of wanting to engage in what I would call surgical self-treatment. In the literature it's sometimes described as genital self-mutilation or autocastration as a way to rid themselves of the hormones associated with the testicles.

They're often very desperate, frantic impaired people who are looking for treatment from someone who knows what they're doing in this area, and unfortunately that's limited to very few people.

(*Id.* at 262.) Generally, Dr. Brown diagnoses GID based on a two- to three-hour face-to-face clinical interview, his experience, and all of the records that he can find. (*Id.* at 263.)

19

e) Dr. Claiborn

Dr. Claiborn testified that, in his opinion, GID is not a mental disease or disorder. (*Id.* at 357.) He believes that a person who has GID does not typically suffer from an impairment in psychological functions. (*Id.* at 364.) According to Dr. Claiborn, people with GID can have mental disorders such as depression and anxiety, but those disorders are not directly a result of being transgendered. (*Id.* at 367.)

Dr. Claiborn uses the DSM in two main ways, for filling out insurance forms and in some cases for forensic evaluations. (*Id.* at 361.) He testified that the DSM is not constructed to be helpful to therapists because it does not address the causes of disorders. (*Id.* at 361-62.)

4. Treatment for Gender Identity Disorder

a) Dr. R. Ettner

Dr. R. Ettner testified about the treatments for the distress that accompanies severe GID. The treatments are referred to as "triadic treatment," which consists of, 1) a real life experience which helps the person socially take on the role and life that they want in the preferred gender; 2) hormones; and 3) surgical treatments involving genital alteration. (Trial Tr. vol. 1, 29, Oct. 22, 2007.) These treatments are set out in the Standards of Care, which is published by WPATH. (*Id.* at 30.) The treatments are also found in the DSM-IV treatment manual, a book that accompanies the diagnostic manual, as well as in other handbooks for clinicians and for professionals in the medical and mental health fields. (*Id.*) The Standards of Care "are a document that articulates professional consensus about the treatment of gender identity disorders, and it's produced by the

20

WPATH organization and distributed throughout the world to organizations such as World He[alth] Organization and other providers of health care worldwide." (*Id.* at 30-31.)

As a treatment, hormone therapy helps those with GID by providing them with a level of well-being because the effect on the brain is one that restores them to a non-distressed, non-dysphoric level of well-being. (*Id.* at 31.) Dr. R. Ettner's clients who started taking hormones while under her care have experienced remarkable changes in their level of well-being, in their overall mental health, and in the way that they conduct their lives. (*Id.* at 32.) For many people, hormonal treatment is sufficient to manage and reduce the gender dysphoria. (*Id.* at 33-34.) Whether a client should have hormone therapy depends on the intensity of the disorder and the distress that the disorder causes him or her. (*Id.* at 35.) If it impairs the person's functioning, occupationally, socially, or in another major arena, and it cannot be managed without medical treatment, at that point one would recommend medical intervention. (*Id.*)

Hormone therapy is not required for all persons with GID. (*Id.* at 39.) Dr. R. Ettner has refused to recommend hormone therapy for a client. (*Id.* at 36.) One common reason for such a decision is that the person does not have the intensity of the disorder to meet the criteria for that treatment. (*Id.*)

There is a role for psychotherapy in treating GID, which consists of four components: 1) educating the patient about the disorder; 2) helping the patient understand and navigate some of the social consequences that accompany GID; 3) following up with the patient after some treatments; and 4) offering support, helping the person find

21

reputable physicians and support groups or other venues for assistance. (*Id.* at 37.) However, psychotherapy cannot talk someone out of GID; it is not a cure. (*Id.* at 38.)

If hormone therapy is medically necessary but not provided, the person is at risk for autocastration, suicide, substance abuse, and depression. (*Id.* at 39.) The psychological risks of being taken off of hormone therapy are depression, autocastration, and suicide. (*Id.* at 41.)

b) Dr. F. Ettner

The nature of the treatments that Dr. F. Ettner prescribes depends upon the level of severity of the GID. (Trial Tr. vol. 1, 101, Oct. 22, 2007.) The symptoms of someone that he considers severe enough to need hormone therapy are:

> These are individuals that will present to me and describe a history of depression, anxiety, sleeplessness, inability to concentrate, inability to maintain their job, family conflict.
>
> And no matter what they've done, whether they have cross-dressed secretively, it's not sufficient. They'll then be referred for therapy and maybe the therapy is not gonna be sufficient and the therapist will then refer those clients to me, and those patients will then receive hormonal therapy.

(*Id.* at 101-02.) Hormone therapy is not medically necessary for every GID patient that has come to Dr. F. Ettner; approximately five to ten percent of his GID patients have been able to go without hormone therapy. (*Id.* at 102.) For those patients with severe GID for whom he prescribes hormone therapy—and in some cases surgery—psychotherapy on its own is not effective as a treatment. (*Id.* at 103.)

The therapeutic effects of hormones on the body of a patient with GID are:

Patients who have GID and qualify for hormones will experience initially – the organ system that will experience the most benefit initially will be the brain.

The dysphoria will tamp down, dysthymia, the depression, anxiety will all tamp down initially.

Other organ systems that eventually will respond, and it will take a good couple months of therapy, include secondary sexual characteristics, in the case of the male to female, breast development, fat deposition on the hips, decrease in muscle mass on the chest, softening of the skin.

(*Id.* at 107-08.)  The birth gender hormones begin to be suppressed, "almost to the point of suppression that is sufficient to represent the gender that that individual is transitioning into." (*Id*. at 108.)

When hormone therapy is withdrawn from a GID patient, the following occurs:

So after being on hormonal therapy for a significant period of time, couple of years, even a year, there could be enough suppression that that testosterone now approaches female levels or the same as female levels withdrawing that hormone, withdrawing estrogens create this cascade of events, the systemic events of stress.

And so stress is monitored in our bodies by the amount of hormone that will secrete or prehormone that will secrete in our pituitary glands.  And this will stimulate our adrenal glands that create lots of cortisol.  And cortisol then affects all these target systems.

For example, in muscles we'll see some muscle wasting, in nerves we'll see neuroexcitability.  We'll see fatty deposition.  There'll be more of a tendency for blood pressure to increase because of water and salt imbalances.

And all of these things can lead to diseases – heart disease, hypertension, diabetes.

23

(*Id.* at 110-11.)  Termination of hormone therapy does not reverse all of the change that occurred to secondary sexual characteristics. (*Id.* at 111.)  In a male-to-female person, gynecomastia or increase in breast size will remain, a lot of the fatty deposition will stay, and some of the muscle wasting will stay. (*Id.)*  On the other hand, hair growth can come back if there are enough hair follicles still present and the natal hormones may begin to increase and create dysphoria again. (*Id.*)  Termination can affect the neurological system and with neuroexcitability, seizure disorder can be seen, and sleeplessness, anxiety, and further depression can occur. (*Id.*)  Suicidal ideation, if it was present, would be accelerated.  (*Id.)*  The effect to the metabolic muscle system, besides muscle wasting, creates higher glucose levels and can lead to diabetes, more water loss, and higher hypertension.  (*Id.* at 112.)  Termination can soften the bones. (*Id.*)  Termination of hormone therapy also affects the cardiovascular system by way of water retention, which increases plasma volume and increases the pressure within the system, and the release of epinephrine and norepinephrine which stimulates the body and can constrict the blood vessels that convey blood to the organs and make the heart beat faster which increases blood pressure.  (*Id.* at 113.)  Finally, withdrawal of hormone therapy affects the immune system due to decreased protein. (*Id.)*  Lymphocytes made in the lymph system that protect people from infection are suppressed. (*Id.*)  Every patient who is taken off hormones will experience these risks chemically. (*Id.* at 114.)  Some patients will experience the effects clinically, others subclinically. (*Id.)*  All patients taken off hormone therapy need to be followed, and all of these organ systems need to be monitored. (*Id.*)

24

Based on these risks, it is not medically acceptable to take someone off of hormone therapy if they do not have to come off for some other medical reason. (*Id.*)

Based on a review of plaintiff Fields' medical records, Dr. F. Ettner formed an opinion to a reasonable degree of medical certainty about the likely effects of withdrawing Fields from hormones. (*Id.*)  He opines that withdrawal could have serious adverse effects on Fields' health and well-being:

> I think, you know, based on the records and looking at her as a transgendered woman, she's diminutive, she had had breast implants, she had been on hormones for a period of time.  All commentary about her in the records declared her as very effeminate.  She was on significant amounts of hormone.
>
> She also in her laboratory tests had an elevated cholesterol. Taking her off would certainly upset her lipid balance, her cholesterol balance.  It could increase her cholesterol levels to even higher levels than these are, and these are pretty high to begin with, 261.   Being that 130 is normal and 261 is abnormal, it would put her at risk for heart disease.
>
> I think also in taking her off of hormones due to her presentation for such a long period of time as a female, the neuroexcitability issues would be very prominent for her, be an increased risk of seizure, increased suicidal ideation.

(*Id.* at 116.)

### c) Dr. Kallas

Dr. Kallas testified about the diagnosis of and treatment for GID.  He considers the DSM to be an authoritative manual for diagnosing mental health disorders. (Trial Tr. vol. 2, 173, Oct. 23, 2007.)  The primary goal of hormone therapy is to reduce gender dysphoria and to improve the psychological adjustment of an individual receiving the hormone therapy. (*Id.* at 174.)   Hormones are medically necessary for some

25

individuals. (*Id.*) Hormone therapy is "probably the most common and accepted treatment for those with severe gender dysphoria" although "it's not the answer for everybody." (*Id.* at 175.) The most widely referenced set of standards for the treatment of severe gender dysphoria is the Standards of Care. (*Id.*)

When asked whether there may be individuals for whom hormones are the only satisfactory route to alleviate their gender dysphoria, Dr. Kallas responded:

> I'm hesitant to agree with that statement exactly as worded.
>
> The Harry Benjamin standards speak to a number of routes for treatment, and those include real life experience, hormonal treatment, surgical reassignment, and – I wouldn't say necessarily that for every single individual with severe gender dysphoria that hormonal treatment is – would be required, but, again, it's a mainstay of treatment, it's one of the primary ways, easily the most common ways that severe gender dysphoria is treated.
>
> I would be hesitant to say that there are individuals where hormones would be the only way that the dysphoria could be – could be alleviated, but there are certainly individuals where it may be difficult to envision that other routes would be as satisfactory.

(*Id.* at 176.) He went on to state:

> I do believe there are individuals where hormonal treatment is medically necessary for the gender dysphoria. Although I would be hesitant to say that it could be the only route in which they could accommodate the gender dysphoria.
>
> There may be individuals – it's difficult to imagine that they could successfully accommodate the gender dysphoria without hormones. I think what I'm saying is very close to what you're saying.

(*Id.* at 177.) By "medically necessary," Dr. Kallas means that there are adverse consequences to psychological well-being if the hormones are not provided. (*Id.*)

To the extent that hormone therapy assists in alleviating gender dysphoria, withdrawal may bring about reemergence of that dysphoria. (*Id.* at 178.) Thus, the person may experience depression, anxiety, difficulty with social or occupational functioning, and suicidal ideation. (*Id.* at 178-79.)

### d) Dr. Brown

Dr. Brown testified that some form of treatment is indicated for anyone who reaches the clinical threshold of severity to be diagnosed with GID. (Trial Tr. vol. 3, 269, Oct. 24, 2007.) Severe GID causes distress that can be relieved by following the treatment set forth in the Standards of Care. (*Id.* at 269-70.) As to whether GID is curable, Dr. Brown stated:

> I'll use my personal experience in answering that question. I've had patients that I started treatment, went through the [S]tandards of [C]are sequential treatments that are described, and in individuals that I'm thinking of in this experience these individuals did have sex reassignment surgery, and I've been able to follow them for as long as 15 years after the surgery, and by any definition of the word "cure" from any dictionary or any medical text, they no longer have the diagnosis of GID. Meaning that the symptoms for which they were treated no longer exist for a significant period of follow-up time afterwards.
>
> And cancer examples are usually five years. If a person doesn't have any evidence of that cancer after treatment five years later they're considered cured. Prior to that they'd be called in remission. And certainly if you follow someone who has had all of these treatments for five to 15 years afterwards with no recurrence of any symptoms of GID at all, I think that that would meet the definition of a cure.

(*Id.* at 271-72.) For some patients, GID can be adequately treated with a combination of psychotherapy and hormones. (*Id.* at 272.) For individuals with severe GID, psychotherapy

alone has never been adequate treatment, "not just in my experience but also in the literature over decades." (*Id.* at 272-73.) With regard to the efficacy of hormone therapy in treating GID, Dr. Brown testified:

> In my clinical practice the patients who are properly diagnosed and followed and following [sic] the [S]tandards of [C]are, again, hormonal treatment really has some fairly striking positive results in reversing or ameliorating a lot of the symptomatology that the patient is presented with.
>
> And these are in the domains of their psychiatric functioning as well as in changes in the body. And there's some interrelationship between the two, but there are emotional and psychiatric responses to hormonal medications that actually precede any changes in the body of the person.

(*Id.* at 273.) There is no other equally effective treatment for these patients. (*Id.*)

Inmates whose hormone therapy has been interrupted and have been seen by Dr. Brown have been evaluated as follows:

> It's uniformly a very bad thing to do medically and psychiatrically.
>
> The patients who had gender dysphoria that may have been largely ameliorated or at least partially controlled, that gender dysphoria comes back fairly rapidly, and often it comes back in a more severe and potentially more dangerous form than it was prior to when they received hormones in the first place.
>
> They may develop suicidality for the first time if they didn't have it before. They may again harbor thoughts of surgical self-treatment, which would mean thinking about removing the testicles as a way to self-treat by removing the testosterone from the body.
>
> They certainly would get depression symptoms, anxiety symptoms, irritability symptoms, crying, having difficulty functioning, all of these things would be likely in patients who were previously stabilized on cross-sex hormones.

(*Id.* at 274.) As to whether treatment for GID was optional, Dr. Brown testified:

28

Again, once a person reaches the clinical threshold and they have the diagnosis, I don't consider treatment optional. It's individualized to a given patient, but the treatment itself is not optional.

Just as in a patient who has prostate cancer, the urologist will present, well, here are your treatment options. You can get radiation, you can get surgery, you can get a combination of the two, you can get chemotherapy. Here are the probabilities in your given case of the likelihood of success with each individual treatment, but the effects are this, this, and this.

It's really something that you need to work out with me what treatment you want to choose, but the treatment itself is not optional unless the person decides that they don't want to continue to live.

(*Id.* at 278.) Dr. Brown has conducted extensive research in the area of genital self-harm and described his findings as follows:

[T]hese are tentative conclusion[s] based on my research which is still ongoing, but the first conclusion was that genital self-harm is in fact surgical self-treatment in prison settings or in other institutional settings where a person with GID, usually moderate to severe, is denied or blocked access to cross-sex hormonal treatment and then they take matters into their own hands as it were and surgical self-treat [sic], and that that's much more common in incarcerated institutionalized settings than it is for people who are in the free world.

(*Id.* at 281-82.)

In Dr. Brown's experience, anti-depressants cannot adequately treat GID because they "don't at all treat the underlying condition." (*Id.* at 284.) Also, GID cannot be adequately managed through psychotropic medications:

No, I don't believe so at all. You may be able to take the edge off of some symptoms by using a variety of medications, but it's like putting a Band-Aid on a burst appendix or giving somebody with a burst appendix pain medication. You know, you might make them feel a little bit better but the underlying condition is what needs to be treated.

29

(*Id.*)  Brown says that under the Standards of Care, a patient is ready for hormone therapy

under the following circumstances:

> In terms of being ready for hormones you have to first be
> eligible.  So eligibility would involve having a prior real-life
> experience or, in the alternative, having a minimum of three
> months of psychotherapy.  Being in the age of majority, so
> we're not treating children in this setting.
>
> And in addition to that, some consolidation of their cross-
> gender identity and satisfactory control of other psychiatric
> comorbidities that may be present at the same time because
> there are often other diagnoses present in people who have
> GID.

(*Id.* at 286-87.)  Gender identity cannot be changed:

> Since gender identity is a subjective construct, it's in the brain,
> it's not in the body, I think people's gender identity is what it is.
>
> Now, their body may not match what their gender identity is in
> their brain.  But there's nothing that I or anyone else can do
> medically, psychiatrically, or surgically to change someone's
> gender identity in their brain.  And that's why we seek to
> change the body, because we don't know any way to
> change the brain to match the body.

(*Id.* at 297.)

> Psychotherapy is not an acceptable means of treating GID:
>
> Well, for example, if you have a marital problem and you're in
> therapy for the marital problem, the psychotherapy, the intent
> of the psychotherapy is to help work through and resolve the
> marital problem.  So it's primary treatment for that problem.
>
> In patients who have GID the psychotherapy is not intended to
> nor designed to cure or eliminate the symptoms that they have;
> it's to help them understand more about themselves, it's
> educational, it's to help them understand the implications of
> the treatment alternatives that they're being presented with
> potentially by other physicians or surgeons, and to help them
> adjust to who it is that they are because that's never gonna
> change.

30

> So, and similar to homosexuality, you don't change a person's
> sexual orientation by working with them psychotherapeutically.
> You help them to understand that this is who they are and that
> that's not gonna change no matter how much psychotherapy
> they get.

(*Id.* at 330-31.) A treatment approach whereby only psychological treatments are available

to help GID patients accept their biological sex would be "absolutely inconsistent" with the

triadic approach to addressing GID. (*Id.* at 332.)

### 5. DOC Policy Prior to Act 105; DOC Reaction to Act 105; DOC Medical and Mental Health Treatment

#### a) Dr. Kallas

Dr. Kallas testified that in approximately 2002 the DOC established the

gender identity committee, which consists of Dr. Kallas, Dr. Burnett, Bureau of Health

Services Director James Greer, the warden of an institution, and a psychologist of an

institution. (Trial Tr. vol. 2, 170, Oct. 23, 2007.) The role of the gender identity committee

"is to consult on policy with respect to gender identity disorder, to review individual cases,

to make determinations about hormonal treatment, especially starting new treatment, and

then to consult in a clinical fashion to the psychologists and psychiatrists who are within

the institutions about gender identity disorder matters." (*Id.*) Prior to Act 105, a person who

came into the prison system on hormone therapy would continue such therapy unless the

prison doctor had a reason to believe that the hormones were inappropriate. (*Id.* at 171.)

When an individual came and requested to be put on new hormone therapy, that request

would go to the GID committee, "and there's a process that's described in our policies

31

about how that would play out." (*Id.*)  The DOC's policy prior to Act 105 was set forth in

Executive Directive 68.  (*Id.*)[5]

_____

[5]Executive Directive 68 provides:

SUBJECT:　　　Scope of Services for the Treatment of Gender Identity Disorder

I.　　　Background

It is the policy of the Wisconsin Department of Corrections (DOC) to provide appropriate treatment services to offenders meeting the criteria for a diagnosis of gender identity disorder (DSM-IV 302.85). Practitioners shall take correctional and community standards of care into consideration when providing treatment services.

II.　　　Definitions

*Diagnostic and Statistical Manual*, 4th Edition, Revised (DSM-IV): The standard manual of psychiatric diagnoses and classification codes.

Gender Identity Disorder: A psychiatric disorder in which a person is not satisfied and is seriously dysphoric with regard to their anatomical gender. In general, this condition is a stable, nonviolent condition and not due to psychosis, but it may accompany other mental disorders.

Hormonal Therapy: The use of hormones to stimulate the development of secondary sexual characteristics such as enlargement of breasts and which may exert systemic effects such as body hair loss.

Sexual Reassignment Therapy: Treatment for gender identity disorder in which one or more of the following are used: hormonal medications, surgical procedures to alter a person's physical appearance so that he/she appears more like the opposite gender and psychological counseling.

II. [sic]　 Guidelines

A.  No surgical procedures for the purpose of sexual reassignment shall be provided to any offenders incarcerated in the WDOC.

B.  After consultation with the Gender Identity Disorder Committee, hormonal therapy for severe gender dysphoria may be initiated by the WDOC physicians. The Gender Identity Disorder Committee will consult with a non-WDOC consultant before approving or denying a request from a WDOC physician for initiating hormonal therapy. If the Committee and the non-WDOC consultant do not agree regarding initiating hormonal therapy for severe gender dysphoria, the DOC Medical Director and non-WDOC Consultant will meet with the Secretary's Office to reach a decision.

C.  An offender who is receiving hormonal medications as a part of an established sexual reassignment therapy regimen under the supervision of a medical doctor at the time of incarceration may be continued on hormonal medications provided that the offender cooperates with the DOC in obtaining confirmation of his/her previous treatment. If an offender chooses to discontinue hormonal medications and then wishes to restart hormonal medications, the committee referenced below will evaluate the request and make a determination.

D.  The offender must agree to sign DOC-1163, Confidential Information Release Authorization, allowing DOC medical and mental health staff access to medical and mental health records regarding all prior treatment related to gender identity disorder.

Act 105 takes away the ability of DOC medical personnel to provide hormone therapy to individuals with GID. (*Id.* at 182.)  Also, because of Act 105, the DOC has not evaluated two inmates who may suffer from GID to determine whether hormone therapy

---

E.  Offenders identified or claiming to suffer from gender identity disorder shall have access to the full range of mental health therapies available through the Wisconsin DOC. They shall have access to therapies in which they may explore their ambivalence, confusion and conflict around sexual identity as well as those services focusing on enabling those with identifiable mental health problems to better adjust to institutional living.

F.  Self-inflicted genital mutilation or other forms of self-mutilation are not consistent with successful sexual reassignment therapy.

*Facility Placement*

A.  In the event that an offender who has completed a surgical sexual reassignment treatment program is committed to the DOC, that offender shall be placed in a correctional facility appropriate for his/her reassigned gender.

B.  In general, offenders shall be placed in facilities in accordance with their gender as determined by their external genitalia.

*Name and Apparel for Inmates with Gender Identity Disorder*

A. The DOC shall use the name of the offender as it appears on the Judgement [sic] of Conviction. The only exception to a name change will be through an order of a judge to have the name of the offender legally changed after the Judgement [sic] of Conviction.  A new Judgement [sic] of Conviction must be issued or the court order must specifically state "change all records".

B. Property and apparel shall be consistent with the offender's determined gender.

*Gender Identity Disorder Management and Treatment Committee*

A. *Composition*: The Committee shall be composed of the DOC Medical Director, the DOC Mental Health Director, the Bureau of Health Services Director or designee, an assigned doctoral prepared psychologist, and a Warden or designee. In addition, a medical specialist in the treatment of gender identity disorder from the community may be retained as a consultant on specific cases. If the offender is identified as a sex offender, the Chief Psychologist, Sex Offender Specialist shall participate as a member.

B. *Function*: The committee shall be convened to address issues in the management of individuals with gender identity disorder after review and referral by the medical director, mental health director or Bureau director. Inmates may be referred to the medical director, mental health director or bureau director to address issues of concern through the committee by institution Wardens or their designees.

The committee shall advise the medical director or treating physician on issues such as appropriate diagnoses, complications of treatment, management issues, and/or the design and implementation of a plan of care.

(Tr. Ex. 2.)

is medically necessary for them. (*Id.*)  Dr. Kallas had concerns about Act 105 because it takes the medical decision out of the hands of health care practitioners with respect to the provision of hormones. (*Id.* at 183.)  He expressed those concerns to his boss, Dr. Burnett, and also to Mr. Margolis, the legislative liaison in the DOC Secretary's office. (*Id.*)  In an email in which Dr. Kallas was responding to a request for information about legislation that takes away the ability to provide hormone therapy (which ultimately became Act 105), Dr. Kallas stated in relevant part:

> The cost of discontinuing treatments would vary from inmate to inmate.  Overall hormones tend to improve psychological well-being for those with gender identity disorder, thus some inmates may stop hormones with relatively little impact, however, others may experience depression, anxiety, disruptive behavior or suicidality.  Additional resources may be needed for time in segregation, clinical observation, or the Wisconsin Resource Center.  Additional suicides or suicide attempts may occur based on such a policy.

(*Id.* at 183-85, Ex. 11.)  The email also stated: "It would be contrary to the medical judgment of the Wisconsin Department of Corrections medical director and mental health director." (*Id.* at 185, Ex. 11.)  When asked why taking away medical decision-making was a concern for him, Dr. Kallas stated: "It's difficult to articulate because it seems so obvious to me, that it's important that doctors are ably [sic] to use their clinical judgment with respect to conditions that are significant, especially when it pertains to medically necessary treatment."  (*Id.* at 186.)

Dr. Kallas testified that Act 105 takes away the ability to provide medically necessary treatment in some cases. (*Id.* at 187.)  He is unaware of any other mental health

34

treatments for medically necessary conditions in individuals or inmates that are barred by law or regulation with the DOC. (*Id.*)

In March 2005, Dr. Kallas testified before the legislature with respect to the bill that became Act 105. (*Id.* at 187-88, Ex. 17.) He informed the legislature that the Standards of Care are considered to be the most authoritative guidelines for the treatment of GID. (*Id.* at 189.) Dr. Kallas emphasized that hormone therapy was a valid treatment on it own, because

> there were some in the legislature who had the belief, or maybe the sponsors of the bill had the belief that starting an individual on hormonal treatment would commit the department to provide surgery.
>
> In other words, that it would start an inmate down the road where there was more of an argument for surgery later on. And this was my effort to try to dispel that notion.
>
> In other words, the individuals, many individuals find successful accommodations just with hormonal treatment and do not desire to go on or need to go on to surgical reassignment.

(*Id.* at 189-90.) He also testified before the legislature that the DOC policy as outlined in Executive Directive 68 was similar to those of many other states and the Federal Bureau of Prisons. (*Id.* at 190.) As for the effect of withdrawing hormones from an individual, Dr. Kallas added:

> [I]f the department were to take away hormones from individuals with gender identity disorder, those individuals may become distressed and despondent, may go to the point of clinical depression or an anxiety disorder or suicidality.
>
> It may result in an increase in staff time for mental health care or placement in WRC, which is the Wisconsin Resource Center, which is our facility for acute care.

It also may lead to disruptive behavior and segregation time, or an increase in psychotropic medications particularly antidepressants, which would offset any cost savings that would be directly attributable to not prescribing hormones.

(*Id.* at 190-91.)

DOC prisons have mental health resources consisting of psychiatric and psychological care. (*Id.* at 197.)  A typical institution with approximately 1000 inmates has a couple of days per week of psychiatric coverage. (*Id.*)  It has four or five full-time psychologists who work Monday through Friday and provide on-call coverage over the weekend. (*Id.*)  In terms of mental health services available to inmates, psychiatrists perform evaluations for psychotropic medications and follow inmates who are on psychotropic medication. (*Id.*)  Psychologists provide evaluations for a number of different purposes and provide treatment which may consist of crisis intervention, counseling, psychotherapy, or monitoring inmates for mental health symptoms. (*Id.*)

It is not uncommon for DOC inmates to have thoughts of suicide. (*Id.* at 198.)  Correctional officers and front line staff are trained in suicide prevention annually. (*Id.*)  Psychology staff intervenes from a mental health perspective if someone is having suicidal thinking, and staff would be available for counseling or for placing someone on suicide watch. (*Id.*)  Psychology staff participates in the decision whether to send an inmate to the Wisconsin Resource Center, which is more like a hospital setting. (*Id.*)  These services are available for any inmate who is at risk for harming himself or herself. (*Id.* at 198-99.)  The DOC system is also equipped to deal with inmates who have depression, anxiety, psychosis, mood disorders, and adjustment disorders. (*Id.* at 199-200.)  These services

36

would be available to an inmate coming into the system on hormone therapy and had hormone therapy withdrawn under Act 105. (*Id.* at 200.)

b) Dr. Burnett

Dr. Burnett testified about the health services that are available for DOC inmates. (*Id.* at 212.) Most DOC facilities have a health services unit centered around primary care, which includes mental health care. (*Id.* at 213.) Most of these units have nursing staff, a physician, and psychiatry and psychology staff. (Id.) The medical portion is similar to an outpatient clinic in the community. (*Id.*) To obtain care, an inmate puts in a health service request, which is evaluated initially by nursing staff and then addressed by the appropriate person. (*Id.*) There are also ongoing appointments for follow-up care or regularly scheduled visits for those with chronic medical conditions such as high blood pressure, diabetes, and hepatitis. (*Id.* at 213-14.)

Dr. Burnett described the process by which inmates would be withdrawn from hormone therapy pursuant to Act 105. (*Id.* at 214.) First, the primary care physician would meet with the inmate and explain the reason for withdrawal of medication and inform the inmate about the potential side effects. (*Id.*) The physician would then issue an order to taper the medication over a period of about two months. (*Id.*) In addition, the inmate would have an appointment with psychology staff to talk about potential withdrawal symptoms and to seek follow-up case as needed. (*Id.*) The inmate would be monitored by health services staff. (*Id.*)

Inmates in the DOC system may present with a variety of medical problems, including cardiovascular problems, gastrointestinal problems, endocrine problems,

37

diabetes, osteoporosis, muscle weakness, and poor wound healing/subject to infection. (*Id.* at 216-20.) Treatment is available for these inmates in DOC institutions, or arrangements will be made to have offsite specialty care when necessary. (*Id.*) The DOC health care personnel do not provide medical treatment to inmates if it is not medically necessary. (*Id.* at 228.)

Some inmates are prescribed hormone therapy for conditions other than GID. (*Id.*) However, Act 105 requires the DOC to withdraw hormone therapy only from inmates who are receiving it to treat their GID. (*Id.*) Inmates who are receiving hormone therapy for health conditions other than GID would not be withdrawn from that hormone therapy because of Act 105. (*Id.*)

Dr. Burnett testified that he agreed that medical care should be left to clinicians. (*Id.* at 229.) He does not know of any other Wisconsin laws or DOC policies banning medical treatments for inmates. (*Id.* at 230.) Dr. Burnett does not believe it was medically appropriate to taper and terminate hormone therapy for inmates with GID. (*Id.*)

6. Security

Atherton testified about the correctional environment as it relates to prison security and indicated that it is dangerous:

> It's highly unique in that we have a collection of human beings that have past histories of having committed felony offenses, many of which are violent and highly aggressive in confined and very small spaces, over long periods of time. This is not like a county jail, this is – prisons are for long periods of time.
>
> So the mere fact that we do that and then over the last 20 years we've doubled and tripled populations in fixed spaces in corrections because of bed space explosion, it makes for a very volatile environment in which safety and the application of

38

safety systems is absolutely critical seven days 24 hours a
day.

(Trial Tr. vol. 3, 412-13, Oct. 24, 2007.) Security concerns include violence, sale and use
of drugs, manufacture of weapons, management of the mentally ill, escape, gangs, and
inmate relationships including sexual relationships. (*Id.* at 413-14.)

Aside from health issues, sexual activity among inmates has a history of
being extremely dangerous and volatile and that is why there are rules prohibiting such
conduct. (*Id.* at 414.) Sexual relationships include consensual and non-consensual sexual
relationships. (*Id.*) An inmate's personal appearance can make that inmate more
vulnerable to sexual assault. (*Id.* at 419.) For example, if an inmate's appearance is
sexually suggestive:

> Well, you know, it's hard for me to distinguish between
> behavior and physical attributes, but if an inmate is small in
> stature and carries themself in sort of an effeminate way, okay,
> then that makes that inmate an automatic target for inmates
> who are interested in sexual aggression or sexual
> relationships.

(*Id.*) An inmate who is feminized might be a victim of assault and could be a center of
conflict among the prison population. (*Id.* at 420.) Atherton does not believe that feminizing
male inmates is consistent with the mission of the DOC because "it raises the level of risk
in general populations that manage inmates who have been feminized in the male
environment." (*Id.* at 422.) The implication is that inmates and staff are going to get hurt.
(*Id.* at 423.)

39

Inmates can feminize themselves to some extent:

There are times where they can modify their uniform and kind of roll their sleeves in a certain way or bring up the – show their midriff by bringing up the top of their uniform top.

You know, in a certain way that's typically feminine, although there are times where there are rules against that.

There are ways of grooming themselves, and sometimes in violation of contraband rules by using various substances to color, you know, do eyebrow liner and blush on the face and cheeks.

That's often attempted, although in most systems I'm aware that that is prohibited by rule.

(*Id.*) However, further feminization "will raise the level of risk specifically." (*Id.* at 424.)

At deposition, Atherton stated that "hormonal therapy may or may not be something – have something to do with physical appearance which are one of many ingredients that may contribute to something that supports sexual attraction from one inmate to another which may or may not arise in the form of an assault." (*Id.* at 426-27.) He also indicated that "it is possible that allowing inmates to have hormone therapy will not cause an increase in sexual assault." (*Id.* at 428.)  Atherton testified that correctional needs, security, and safety must be considered along with medical and mental health concerns.  (*Id.* at 431.)  One overriding the other "just simply doesn't work . . . in the correctional world." (*Id.*)

The Colorado Department of Corrections has a policy of allowing prisoners with GID to have hormone therapy. (*Id.* at 432.)  Atherton believes that the policy is reasonable and has never argued that the policy should be changed. (*Id.*)  When asked whether he agreed that the policy does not by itself create security problems, Atherton

40

testified that the policy had a good history and that security is able to implement it fairly well. (*Id.* at 432-33.)

ANALYSIS

Plaintiffs contend that enforcing Act 105 to deny medically necessary treatment to plaintiffs violates their rights under the Eighth Amendment and the Equal Protection Clause, and the rights of all transsexual inmates under the Eighth Amendment and the Equal Protection Clause. They seek a permanent injunction barring enforcement of Act 105.

Defendants submit that the plaintiffs' Eighth Amendment facial challenge fails because Act 105 is not unconstitutional in all circumstances where it would be applied. (Defs.' Trial Br. at 3.) Specifically, not all individuals with GID want or qualify for hormones or reassignment surgery. Next, defendants contend that plaintiffs' Eighth Amendment as-applied challenge to Act 105 fails because the evidence establishes that, "under the holding in *Maggert [v. Hanks*, 131 F.3d 670 (7th Cir. 1997)], Act 105 does not violate the Eighth Amendment by preventing specific forms of 'curative treatment' for gender dysphoria." (*Id.* at 5.) With respect to plaintiffs' Fourteenth Amendment equal protection challenges, defendants assert that hormone therapy results in a more effeminate appearance, and the more effeminate a male inmate looks, the more likely he will be victimized in prison. By eliminating the availability of hormone therapy, the defendants reason that Act 105 is rationally related to the DOC's interests in protecting these inmates from harm and maintaining the safety and security of other inmates, staff, and the institution.

41

## 1. Eighth Amendment Claim

To establish liability under the Eighth Amendment, a prisoner must show: 1) that his medical need was objectively serious; and 2) that the state official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Factors that indicate a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez*, 111 F.3d at 1373 (citations omitted). A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or the unnecessary infliction of pain. *See Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999); *Gutierrez*, 111 F.3d at 1371.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally

42

reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998).

Neither negligence nor even gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman*, 241 F.3d at 845 (citing *Farmer*, 511 U.S. at 840-42).

Mere difference of opinion among medical personnel regarding a plaintiff's appropriate treatment does not give rise to deliberate indifference. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). However, deliberate indifference may be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.*; *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (citing as examples "the leg is broken, so it must be set; the person is not breathing, so CPR must be administered").

"[T]o prevail on an Eighth Amendment claim 'a prisoner is not required to show that he was literally ignored.'" *Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). On the other hand, a defendant's contention that a medical care claim fails because the prisoner "received some treatment overlooks the possibility that the treatment [the prisoner] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted)).

43

The court turns to a review of cases containing claims brought by prisoners with GID issues to help frame the legal landscape. The Seventh Circuit Court of Appeals has issued two opinions in this regard. In *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987), the court held that an inmate stated a valid claim under the Eighth Amendment in connection with denial of medical treatment for transsexualism. The prisoner in that case was a biological male who underwent nine years of estrogen therapy before incarceration. *Id.* at 410. Once incarcerated the inmate was denied all medical treatment - chemical, psychiatric or otherwise - for GID and related medical needs. *Id.* In concluding that the complaint stated a claim, the court first found that transsexualism was a serious medical need. *Id.* at 411-13.

Next, the court determined that the complaint contained allegations indicating that the defendants were deliberately indifferent to that need because they allegedly "failed to provide the plaintiff with any kind of medical treatment, not merely hormone therapy, for her gender dysphoria." *Id.* at 413. The court went on to say,

> We therefore conclude that plaintiff has stated a valid claim under the Eighth Amendment which, if proven, would entitle her to some kind of medical treatment. It is important to emphasize, however, that she does not have a right to any particular type of treatment, such as estrogen therapy which appears to be the focus of her complaint. The only two federal courts to have considered the issue have refused to recognize a constitutional right under the Eighth Amendment to estrogen therapy provided that some other treatment option is made available. *See Supre v. Ricketts*, 792 F.2d 958 (10th Cir.1986); *Lamb v. Maschner*, 633 F. Supp. 351 (D.Kansas 1986). Both of these courts nevertheless agreed that a transsexual inmate is constitutionally entitled to some type of medical treatment.

44

In *Supre v. Ricketts*, the plaintiff, an inmate in the Colorado Department of Corrections, was examined by two endocrinologists and a psychiatrist. These doctors considered estrogen treatment, but ultimately advised against it, citing the dangers associated with this controversial form of therapy. Instead they prescribed testosterone replacement therapy and mental health treatment consisting of a program of counseling by psychologists and psychiatrists. Given the wide variety of options available for the treatment of the plaintiff's psychological and physical medical conditions, the Tenth Circuit refused to hold that the decision not to provide the plaintiff with estrogen violated the Eighth Amendment as long as some treatment for gender dysphoria was provided. Similarly, in *Lamb v. Maschner*, the plaintiff, an inmate at the Kansas State Penitentiary, had been evaluated by medical doctors, psychologists, psychiatrists and social workers and was undergoing some type of mental treatment. As a result of this treatment, the court held that the defendant prison officials were not constitutionally required to provide the plaintiff with pre-operative hormone treatment and a sex change operation.

The courts in *Supre* and *Lamb* both emphasized that a different result would be required in a case where there had been a total failure to provide any kind of medical attention at all. That is precisely the type of case before us. We agree with the Tenth Circuit that given the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment. But no such informed judgment has been made here. While we cannot and will not prescribe any overall plan of treatment, the plaintiff has stated a claim under the Eighth Amendment entitling her to some kind of medical care.

*Id.* at 413-14.

The other Seventh Circuit case to address GID is *Maggert v. Hanks*, 131 F.3d 670 (7th Cir. 1997). In *Maggert*, the court affirmed dismissal of the action because the prisoner failed to create a genuine issue of material fact that he had GID. *Id.* at 671. However, the court then addressed "a broader issue, having to do with the significance of

45

gender dysphoria in prisoners' civil rights litigation." *Id.* First, the court defined gender

dysphoria, "the condition in which a person believes that he is imprisoned in a body of the

wrong sex, that though biologically a male (the more common form of the condition) he is

'really a female,'" as a "serious psychiatric disorder." *Id.* Treatment, or "the cure," for

transsexualism, was also discussed:

> The cure for the male transsexual consists not of psychiatric
> treatment designed to make the patient content with his
> biological sexual identity - that doesn't work - but of estrogen
> therapy designed to create the secondary sexual
> characteristics of a woman followed by the surgical removal of
> the genitals and the construction of a vagina-substitute out of
> penile tissue.
>
> . . . .
>
> Someone eager to undergo this mutilation is plainly suffering
> from a profound psychiatric disorder.

*Id.* However, prisons do not necessarily have a duty to authorize these hormonal and

surgical curative procedures:

> Withholding from a prisoner an esoteric medical treatment that
> only the wealthy can afford does not strike us as a form of
> cruel and unusual punishment. It is not unusual; and we
> cannot see what is cruel about refusing a benefit to a person
> who could not have obtained the benefit if he had refrained
> from committing crimes. We do not want transsexuals
> committing crimes because it is the only route to obtaining a
> cure.
>
> It is not the cost per se that drives this conclusion. For life-
> threatening or crippling conditions, Medicaid and other public-
> aid, insurance, and charity programs authorize treatments that
> often exceed $100,000. Gender dysphoria is not, at least not
> yet, generally considered a severe enough condition to warrant
> expensive treatment at the expense of others than the person
> suffering from it. That being so, making the treatment a
> constitutional duty of prisons would give prisoners a degree of
> medical care that they could not obtain if they obeyed the law.

46

*Id. at 672.* Finally, the court stated: "We conclude that, except in special circumstances

that we do not at present foresee, the Eighth Amendment does not entitle a prison inmate

to curative treatment for his gender dysphoria." *Id.* at 672.

In *Phillips v. Michigan Department of Corrections*, 731 F. Supp. 792, 801

(W.D. Mich. 1990), the court granted a prisoner's motion for preliminary injunction ordering

correctional officials to provide the inmate with estrogen therapy. The prisoner in that case

was a thirty-four-year-old male-to-female transsexual who lived as a woman since age

seventeen. *Id.* at 793-94. Prior to incarceration, the inmate had a number of "surgeries

and other procedures to enhance her appearance as a female, including electrolysis, a

brow lift, dermabrasions, a chemical face peel, jaw reduction, a chin implant, and breast

implant surgery." *Id.* at 794. In addition, the inmate took estrogen treatment beginning at

the age of seventeen or eighteen to slow hair growth, soften skin, and to further develop

the breast implants and female characteristics. *Id.* Not long after incarceration, the plaintiff

was examined by a Michigan Department of Corrections physician who stopped the

hormonal treatments and denied requests for brassieres. *Id.* The prisoner's request for

brassieres was later granted, after the physician's supervisor intervened. *Id.* In granting

the request for a preliminary injunction, the court found that the prisoner had a serious

medical need and that the defendant denied medical care through both intentional conduct

and deliberate indifference:

> The denial of medical care in this case stems from at least
> three sources – which in concert violate plaintiff's right under
> the constitution to be free from cruel and unusual punishment.
> A result decried in *Meriwether* and in dicta by the *Supre* and
> *Lamb* courts is present here: defendant has failed to provide
> plaintiff with treatment of any kind. And, as was the plaintiff in

> *Meriwether*, plaintiff has been the subject of ridicule and
> offensive remarks at the hands of Dr. Opika. Third, this Court
> characterizes defendant's conduct in this case as conduct
> which actually reversed the therapeutic effects of previous
> treatment. It is one thing to fail to provide an inmate with care
> that would improve his or her medical state, such as refusing
> to provide sex reassignment surgery or to operate on a long-
> endured cyst. Taking measures which actually reverse the
> effects of years of healing medical treatment, as I observe
> here, is measurably worse, making the cruel and unusual
> determination much easier.

*Id.* at 800 (footnote omitted).

In *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 158 (D. Mass. 2002), plaintiff Kosilek was a male-to-female transsexual sentenced to life in prison. Since becoming incarcerated in 1990, Kosilek had tried to access proper diagnosis and treatment, but such claims were consistently denied by the institution. *Id.* at 159. While incarcerated, Kosilek tried to commit suicide on two occasions and also attempted self-castration. *Id.* at 158. Kosilek also complained of being in severe mental anguish. *Id.* The prisoner sued the Massachusetts Department of Corrections and Commissioner Michael Maloney, who in 2000 had adopted a blanket policy regarding the treatment of transsexuals in prisons. *Id.* Under the policy, transsexuals who had received treatment by doctors prior to incarceration could have that treatment continued after incarceration; however, transsexuals taking hormones that had not been prescribed by a doctor were not permitted to continue hormone usage in prison. *Id.* at 159-60. The policy also denied the possibility of any inmate receiving gender reassignment surgery. *Id.* at 160. Since Kosilek's transsexualism was undiagnosed, the policy denied access to doctors for both treatment and diagnosis for GID. *Id.*

48

The court found that Kosilek's GID was a serious medical need. *Id.* at 184. Kosilek's GID "has prompted him to attempt suicide twice while incarcerated, and to try to castrate himself as well. There is a significant risk that he will attempt to kill, mutilate, or otherwise harm himself again if he is not afforded adequate treatment for this disorder." *Id.* Next, the court found that Kosilek had not been offered adequate treatment for the serious medical need in that "[t]he services now being offered Kosilek are not sufficient to diminish his intense emotional distress, and the related risks of suicide and self-mutilation, to the point at which he would no longer be at a substantial risk of serious harm." *Id.* at 185. The court reasoned that "no informed medical judgment has been made by the DOC concerning what treatment is necessary to treat adequately Kosilek's severe gender identity disorder." *Id.* at 186. The Massachusetts Department of Corrections policy, also known as the Guidelines, prevented an individualized medical assessment:

> However, the Guidelines preclude the possibility that Kosilek will ever be offered hormones or sex reassignment surgery, which are the treatments commensurate with modern medical science that prudent professionals in the United States prescribe as medically necessary for some, but not all, individuals suffering from gender identity disorders. The Guidelines, in effect, prohibit forms of treatment that may be necessary to provide Kosilek any real treatment. Maloney's decision to implement the Guidelines precluded the medical professionals and social workers he employs and regularly relies upon from even considering whether hormones should be prescribed to treat Kosilek's severe gender identity disorder.

*Id.* at 186 (internal citation omitted). Thus, the court concluded that Kosilek satisfied the objective component of the Eighth Amendment. *Id.* at 189.

However, the court found that Maloney's failure to provide Kosilek with adequate care was not due to deliberate indifference. *Id.* at 189-92. Maloney's actions

49

may have seemed ignorant, if not malicious; however, the court pointed out that his actions were those of "a defendant with a legal problem" and were not done to inflict pain on Kosilek. *Id.* at 162, 191. Finally, the court concluded that Maloney was not likely to be indifferent to Kosilek's serious medical need in the future. *Id.* at 193-95. It reasoned that Maloney "is now on notice that Kosilek's severe gender identity disorder constitutes a serious medical need" and, therefore, "the DOC has a duty to provide Kosilek adequate treatment." *Id.* at 193. The court continued:

> It is permissible for the DOC to maintain a presumptive freeze-frame policy. However, decisions as to whether psychotherapy, hormones, and/or sex reassignment surgery are necessary to treat Kosilek adequately must be based on an "individualized medical evaluation" of Kosilek rather than as "a result of a blanket rule." Those decisions must be made by qualified professionals. Such professionals must exercise sound medical judgment, based upon prudent professional standards, particularly the Standards of Care.

> Thus, the court expects that Maloney will follow the DOC's usual policy and practice of allowing medical professionals to assess what is necessary to treat Kosilek. As the DOC does not employ anyone with expertise in treating gender identity disorders, the DOC may decide to follow its regular practice of retaining an outside expert to evaluate Kosilek and to participate in treating, or recommending treatment for him.

> The evidence demonstrates that, at a minimum, Kosilek should receive genuine psychotherapy from, or under the direction of, someone qualified by training and experience to address a severe gender identity disorder. It will be Kosilek's obligation to cooperate in establishing a proper relationship with his therapist(s). The Standards of Care indicate that such therapy, or such therapy and pharmacology, may be sufficient to reduce the anguish caused by Kosilek's gender identity disorder so that it no longer constitutes a serious medical need.

> If psychotherapy, and possibly psychopharmacology, do not eliminate the significant risk of serious harm that now exists, consideration should be given to whether hormones should be

50

prescribed to treat Kosilek. Administering female hormones to a male prisoner in a male prison could raise genuine security concerns. Maloney would be entitled to consider whether those concerns make it necessary to deny Kosilek care that the medical professionals regard as required to provide minimally adequate treatment for his serious medical need.

. . . .

As the Standards of Care explain, "hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross-living or surgery." If psychotherapy, hormones, and possibly psychopharmacology are not sufficient to reduce the anguish caused by Kosilek's gender identity disorder to the point that there is no longer a substantial risk of serious harm to him, sex reassignment surgery might be deemed medically necessary. If that occurs, Maloney may consider whether security requirements make it truly necessary to deny Kosilek adequate care for his serious medical need. If and when he makes such a decision, a court may have to determine again whether the Eighth Amendment has been violated.

*Id.* at 193-95 (internal citations omitted).

In *De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003), the court of appeals reversed the district court's dismissal of the complaint for failure to state a claim. The plaintiff in that case, a biological male, had GID and was incarcerated in the custody of the Virginia Department of Corrections since 1983. *Id.* at 632. Department of Corrections doctors diagnosed the prisoner with GID and prescribed estrogen from 1993 until 1995, at which time the treatment was terminated pursuant to a new Department of Corrections policy. *Id.* The policy provided that neither medical nor surgical interventions related to gender or sex change would be provided to inmates with GID. *Id.* Inmates entering prison taking hormone medication or already receiving such medication were to be informed of the policy and then the medication would be tapered immediately and afterward

51

discontinued. *Id.* Following termination of the hormone medication, the prisoner developed an uncontrollable urge to mutilate his genitals. *Id.* Repeatedly, the inmate requested resumption of the hormone therapy and treatment by a gender specialist, however, those requests were denied and the self-mutilation continued. *Id.* As an initial matter, the court held that the plaintiff's "need for protection against continuous self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." *Id.* at 634 (citing *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981)). Next, it found that the inmate stated an Eighth Amendment claim by alleging inadequate medical treatment to protect the inmate from the compulsion to self-mutilate. *Id.* at 635.

In *Brooks v. Berg*, 270 F. Supp. 2d 302 (N.D.N.Y.), *vacated in part on other grounds,* 289 F. Supp. 2d 286 (N.D.N.Y. 2003), a prisoner, who was a biological male, diagnosed himself with GID. *Id.* at 304. The prisoner sought treatment by writing letters to a Mental Health Satellite Unit and to a supervisor; however, he never received a response. *Id.* The prisoner then filed suit alleging that the defendants failed to provide him with necessary medical treatment for his serious medical need in violation of the Eighth Amendment, and asking the court to force the defendants to allow him to see a doctor qualified to propose a course of treatment. *Id.* at 305, 306. Pursuant to a Department of Corrections policy, inmates who could prove that they received hormone therapy prior to incarceration might be eligible for continued hormone therapy. *Id.* at 305. The policy further stated that transsexual surgical operations were not honored during incarceration. *Id.*

52

The court found that the defendants were deliberately indifferent to the prisoner's serious medical need:

> Defendants do not contest Plaintiff's claim that he was never treated for GID notwithstanding numerous requests for treatment. In addition, Defendants have not provided the Court with any evidence showing that the decision to refuse Plaintiff treatment was based on sound medical judgment. Finally, Defendants have failed to submit any evidence that they were not aware that Plaintiff's health could be jeopardized if treatment was refused. Accordingly, the Court finds that Defendants have failed to establish, as a matter of law, that Plaintiff was provided adequate treatment for his serious medical needs.

*Id.* at 310. The court went on to say:

> This blanket denial of medical treatment is contrary to a decided body of case law. Prisons must provide inmates with serious medical needs some treatment based on sound medical judgment. There is no exception to this rule for serious medical needs that are first diagnosed in prison. Prison officials are thus obliged to determine whether Plaintiff has a serious medical need and, if so, to provide him with at least some treatment. Prison officials cannot deny transsexual inmates all medical treatment simply by referring to a prison policy which makes a seemingly arbitrary distinction between inmates who were and were not diagnosed with GID prior to incarceration. In light of the numerous cases which hold that prison officials may not deny transsexual inmates all medical attention, especially when this denial is not based on sound medical judgment, the Court finds that Defendants have failed to establish as a matter of law that their actions were objectively reasonable.

*Id.* at 312.

In *Praylor v. Texas Department of Criminal Justice*, 430 F.3d 1208, 1208-09 (5th Cir. 2005), a transsexual state prison inmate sought an injunction instructing the Texas Department of Criminal Justice (TDCJ) to provide him with hormone therapy and brassieres. The court concluded that the prisoner was not entitled to such treatment:

53

This circuit has not addressed the issue of providing hormone treatment to transsexual inmates. Other circuits that have considered the issue have concluded that declining to provide a transsexual with hormone treatment does not amount to acting with deliberate indifference to a serious medical need. *See, e.g., White v. Farrier*, 849 F.2d 322 (8th Cir. 1988) (acknowledging that transsexualism is a serious medical condition, but holding that declining to provide hormone therapy did not constitute deliberate indifference to that medical need); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) (holding transsexual prisoner has no constitutional right to "any particular type of treatment, such as estrogen therapy"); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) (concluding that declining to provide hormone therapy did not constitute deliberate indifference when prison officials offered alternate treatment). Assuming, without deciding, that transsexualism does present a serious medical need, we hold that, on this record, the refusal to provide hormone therapy did not constitute the requisite deliberate indifference.

In Praylor's case, the record reflects that he did not request any form of treatment other than hormone therapy. Testimony from the medical director at the TDCJ revealed that the TDCJ had a policy for treating transsexuals, but that Praylor did not qualify for hormone therapy because of the length of his term and the prison's inability to perform a sex change operation, the lack of medical necessity for the hormone, and the disruption to the all-male prison. *Cf. De'Lonta v. Angelone*, 330 F.3d 630, 635 (4th Cir. 2003). Moreover, the director testified that Praylor had been evaluated on two occasions and denied eligibility for hormone treatment and that the TDCJ did provide mental health screening as part of its process for evaluating transsexuals. *See Supre*, 792 F.2d at 963. Accordingly, based upon the instant record and circumstances of Praylor's complaint, the denial of his specific request for hormone therapy does not constitute deliberate indifference. *See Meriwether*, 821 F.2d at 413; *Supre*, 792 F.2d at 963.

*Id.* at 1209.

Plaintiffs contend that the defendants' enforcement of Act 105 to deny them medically necessary treatment violates the Eighth Amendment because it results in

54

objectively inadequate care for an objectively serious medical need that DOC medical personnel acknowledge is a condition requiring treatment. In response, the defendants maintain that the evidence in this case shows, under the holding in *Maggert*, 131 F.3d at 670, that Act 105 does not violate the Eighth Amendment by preventing specific forms of "curative treatment" for gender dysphoria. The defendants submit that courts have held that transsexual inmates have no constitutional right to a particular type of treatment, and that *Maggert* supports Act 105 and Wisconsin's decision to limit the availability of specific forms of treatment for inmates with GID.

Several courts, including the Seventh Circuit, have considered GID or transsexualism a "serious medical need" for the purposes of the Eighth Amendment. *See Meriwether*, 821 F.2d at 411-13; *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Wolfe v. Horn*, 130 F. Supp. 2d 648, 652 (E.D. Pa. 2001); *Phillips*, 731 F. Supp. at 792. Based on the evidence presented in the bench trial in this case, this court agrees.

Inasmuch as this court finds that GID is a severe medical condition, it must now consider whether enforcement of Act 105 against these plaintiffs constitutes deliberate indifference to their serious medical needs.

As an initial matter, the defendants' reliance on *Maggert* is misplaced because this case is distinguishable. First, DOC doctors evaluated the plaintiffs clinically and determined that hormone therapy is medically necessary to treat their conditions. Moreover, the evidence establishes that DOC health care personnel provide medical treatment to inmates only after they have concluded that the treatment is medically

55

necessary. Act 105 undermines the doctor-patient relationship of DOC physicians and inmates by preventing treatments that those health care providers, in their clinical judgment, determined to be warranted. Second, the plaintiffs in this case were receiving hormone therapy prior to their incarceration in DOC institutions; therefore, the concern that transsexuals may commit crimes so the state will pay for their care, expressed in *Maggert*, 131 F.3d at 672, does not pertain to these plaintiffs. Further, the evidence indicates that the cost to the DOC of withdrawing hormone therapy may be greater than the cost of continuing the treatment prescribed by DOC health care professionals. Third,, the plaintiffs in this case are not arguing entitlement to a specific treatment, rather they are simply contending that Act 105 violates their rights under the Eighth Amendment because it deprives DOC medical personnel of their ability to provide inmates with appropriate treatment.

This court is persuaded that the enforcement of Act 105 prevents DOC doctors from providing the treatment that they have determined is medically necessary to treat the plaintiffs' serious conditions. Notably, in approximately 2002, the DOC established a gender identity committee consisting of Dr. Kallas, Dr. Burnett, Bureau of Health Services Director James Greer, the warden of an institution, and a psychologist of an institution. (Trial Tr. vol. 2, 170, Oct. 23, 2007.) The gender identity committee "is to consult on policy with respect to gender identity disorder, to review individual cases, to make determinations about hormonal treatment, especially starting new treatment, and then to consult in a clinical fashion to the psychologists and psychiatrists who are within the institutions about gender identity disorder matters." *Id.* Consequently, a person who came into the prison system on hormone therapy would continue such therapy unless the

prison doctor had a reason to believe that the hormones were inappropriate.  *Id.* at 171.  When an individual requested to be put on new hormone therapy, that request would go to the gender identity committee, which would process the request in accordance with DOC policies.  *Id.*

Plaintiff Fields was incarcerated in 2005 at which time the DOC confirmed Fields' GID diagnosis and continued hormone therapy.  It was determined that Fields had received feminizing hormone therapy continuously starting in 1996 and had undergone breast augmentation in 2003.  Plaintiff Davison was diagnosed with GID in 2005 and began hormone therapy for treatment, which the DOC has continued during Davidson's incarceration.  Prior to receiving hormone therapy, Davison attempted suicide by jumping off a roof.  Plaintiff Moaton began taking feminizing hormones in the late 1990s, and commenced medically prescribed hormone therapy in 2000.  The DOC continued that treatment after Moaton's incarceration.  Moaton experienced suicidal ideation in the past, especially after being removed from hormone therapy.

In 2006, because of the passage of Act 105, the DOC began to taper the hormone therapy of the plaintiffs, all of whom, to varying degrees, had feminine physical characteristics as a result of hormone usage.  Following the reduction of hormone therapy, plaintiff Fields experienced nausea, muscle weakness, loss of appetite, increased hair growth, skin bumps, and depression; plaintiff Davison had increased and darker hair growth, voice deepening, breast reduction and leakage, mood swings, mental and emotional instability, hot flashes, and body aches; and plaintiff Moaton grew chest and facial hair, complained of increased tenderness in the chest and groin, and complained of skin breakouts, hot flashes, and depression.  All of the symptoms were abated when the

57

plaintiffs' hormone therapy was reinstated after the court issued the preliminary injunction in this action.

The legislative history of Act 105 demonstrates that the bill was passed despite objections from DOC medical personnel and that the only correctional or medical expertise offered during the legislative hearings was that of Dr. Kallas and Dr. Burnett. Dr. Kallas informed the legislature that the Standards of Care are considered to be the most authoritative guidelines for the treatment of GID, emphasized that hormone therapy was a valid treatment on its own, and stated that if the DOC were to take away hormones from individuals with GID, those persons may become distressed and despondent to the point of clinical depression, anxiety disorder, or suicidality. He also explained that this may result in an increase in staff time for mental health care or placement at the Wisconsin Resource Center, and that it may also lead to disruptive behavior as well as segregation time, or an increase in psychotropic medications, particularly antidepressants, which would offset any cost savings attributable to not prescribing hormones.

At trial, outside physician Dr. R. Ettner testified that the intensity of the distress that people with GID experience varies depending on the severity of the disorder. Some people cannot function because the disorder is so intense and severe while others experience less discomfort. For those with severe GID, symptoms may include depression, anxiety, irritability, suicidal ideation, suicide attempts, and self-mutilation or autocastration. When asked why the taking away of medical decision-making was a concern, Dr. Kallas added: "It's difficult to articulate because it seems so obvious to me, that it's important that doctors are abl[e] to use their clinical judgment with respect to conditions that are significant, especially when it pertains to medically necessary

58

treatment." (Trial Tr. vol. 2, 186, Oct. 23, 2007.) DOC Medical Director Dr. Burnett further testified that he did not believe it was medically appropriate to taper and terminate hormone therapy for inmates with GID.

Additionally, plaintiffs contend that on its face Act 105 violates the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment because it applies in every instance in which a DOC medical provider has prescribed hormone therapy or sexual reassignment surgery. Plaintiffs argue

> that inmates do not dictate what medical care they receive; only DOC medical personnel can determine what treatments are medically necessary and appropriate. Consequently, even if an inmate with GID requested hormones or surgery, DOC's practice - even before the passage of Act 105 - would have been to deny such medical care unless it was medically necessary. The passage of Act 105 did not change this practice. What it did is deny DOC medical personnel the discretion they had before to prescribe hormones or surgery, when, in their own judgment, they were medically necessary.
>
> This blanket denial of medical judgment mandated by Act 105 in all the statute's applications violates the Eighth Amendment, for the same reasons that Act 105's application to Plaintiffs violates that Amendment. Plaintiffs have been taking hormones for many years, so cutting off their hormone therapy is the denial of necessary medical treatment that places them at great risk of harm, and induces certain withdrawal symptoms. The denial of necessary medical care to persons who have had it in the past does not distinguish Plaintiffs under the Eighth Amendment and Equal Protection Clause from transsexuals newly diagnosed with GID and prescribed the treatment for the first time by DOC health care professionals.

(Pl.'s Corrected Tr. Br. at 29-30.) This court agrees.

The defendants acknowledge that Act 105 removes even the consideration of hormones or surgery for inmates with gender issues and that the DOC halted evaluations of inmates with GID for possible administration of hormone therapy because

59

of the Act. (Stip. FOF ¶ 52, Defs.' Tr. Br. at 2.) However, in determining whether a facial challenge to Act 105 may succeed here, the defendants submit that the court must take into account all inmates in DOC custody for whom hormone therapy or sexual reassignment surgery would be considered as treatment for gender issues. If that is done, they maintain that there are circumstances where Act 105 may be applied without violating the Constitution, and that, as a result, the plaintiffs' facial challenge to the law must fail. Unfortunately, the defendants do not support this point.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 746 (1987). In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), the Court described the appropriate class for the purpose of determining the validity of an abortion statute:

> Respondents attempt to avoid the conclusion that § 3209 is invalid by pointing out that it imposes almost no burden at all for the vast majority of women seeking abortions. They begin by noting that only about 20 percent of the women who obtain abortions are married. They then note that of these women about 95 percent notify their husbands of their own volition. Thus, respondents argue, the effects of § 3209 are felt by only one percent of the women who obtain abortions. Respondents argue that since some of these women will be able to notify their husbands without adverse consequences or will qualify for one of the exceptions, the statute affects fewer than one percent of women seeking abortions. For this reason, it is asserted, that statute cannot be invalid on its face. We disagree with respondents' basic method of analysis.

> The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. For example, we would not

60

say that a law which requires a newspaper to print a candidate's reply to an unfavorable editorial is valid on its face because most newspapers would adopt the policy even absent the law. *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974). The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.

Respondents' argument itself gives implicit recognition to this principle, at one of its critical points. Respondents speak of the one percent of women seeking abortions who are married and would choose not to notify their husbands of their plans. By selecting as the controlling class women who wish to obtain abortions, rather than all women or all pregnant women, respondents in effect concede that § 3209 must be judged by reference to those for whom it is an actual rather than an irrelevant restriction. Of course, as we have said, § 3209's real target is narrower even than the class of women seeking abortions identified by the State: it is married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement. The unfortunate yet persisting conditions we document above will mean that in a large fraction of the cases in which § 3209 is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid.

*Id.* at 894-95 (internal citation omitted); *see also Gonzales v. Carhart*, 127 S. Ct. 1610, 1639 (2007) (holding that the Partial Birth Abortion Act of 2003's ban "applies to all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications").

In certain cases, as with the plaintiffs in this case, the effect of Act 105 is to withdraw an ongoing course of treatment, the result of which has negative medical consequences. In other cases, the effect of Act 105 is to prevent DOC medical personnel from evaluating inmates for treatment because such evaluation would be futile in light of

61

Act 105's ban on the treatment they may determine to be medically necessary for the health of the inmate.

It is undisputed that Act 105 has prevented the DOC from undertaking thorough evaluations of inmates Erik, a/k/a Erika, Huelsbeck and Kenneth, a/k/a Karen, Krebs to determine whether hormone therapy is medically necessary for them.

Act 105 bars doctors and other DOC medical personnel from providing treatment, namely, hormone therapy and sex reassignment surgery, that they may determine to be medically necessary. Thus, the possibility that other DOC inmates may have conditions that may not require hormone therapy or the possibility that a particular inmate such as Huelsbeck or Krebs may not medically require hormone therapy does not repel a facial challenge to Act 105. If DOC doctors evaluate any DOC inmate and find that hormone therapy is medically necessary, then that inmate is within the group or class of inmates to whom Act 105 applies. The case law indicates that the controlling class for a facial challenge to a statute is "the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894.

It is well established that prison officials may not substitute their judgments for a medical professional's prescription. "Of course they cannot." *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) (citing *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999); *Johnson v. Hay*, 931 F.2d 456, 461 (8th Cir. 1991)). If a prison official consciously chooses to disregard a nurse's or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference. *Zentmyer*, 220 F.3d at 812.

In this case, Act 105 bars the use of hormones "to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender," as well as sexual reassignment surgery "to alter a person's physical appearance so that the person appears more like the opposite gender." Wis. Stat. § 302.386(5m)(a). The statute applies irrespective of an inmate's serious medical need or the DOC's clinical judgment if at the outset of treatment, it is possible that the inmate will develop the sexual characteristics of the opposite gender. The reach of this statute is sweeping inasmuch as it is applicable to any inmate who is now in the custody of the DOC or may at any time be in the custody of the DOC, as well as any medical professional who may consider hormone therapy or gender reassignment as necessary treatment for an inmate.

## 2. Equal Protection Claim

Recently, the Seventh Circuit Court of Appeals reiterated the standard to be applied in equal protection cases where no fundamental right or suspect classification is at issue:

> The purpose of the Equal Protection Clause of the Fourteenth Amendment is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Where (as here) no fundamental right or suspect classification is at issue, equal protection claims are evaluated under the rational-basis standard of review. To prevail, a plaintiff must prove the following: (1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest.

63

*Smith v. City of Chicago*, 457 F.3d 643, 650-51 (7th Cir. 2006) (internal citations omitted). Thus, the court applies rational basis review to plaintiffs' equal protection claim.

The defendants contend that by eliminating the availability of hormone therapy and sexual reassignment surgery, Act 105 is rationally related to the DOC's interests in protecting effeminate-appearing inmates from harm and maintaining the safety and security of other inmates, staff, and the institution.

Act 105 takes away the DOC's discretion to provide "hormonal therapy" to the plaintiffs. "'Hormonal therapy' means the use of hormones to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender." Wis. Stat. § 302.386(5m)(a). It is undisputed that the DOC sometimes prescribes hormone therapy for reasons that do not have to do with GID, such as estrogen replacement therapy in post-menopausal years, or for congenital or hormonal disorders.

The evidence establishes that GID is the only medically necessary condition for which mental health treatments are barred by law or regulation within the DOC. Act 105 requires the DOC to withdraw hormone therapy only from inmates who are using it to treat their GID. Moreover, there is no evidence of any other Wisconsin laws banning medical treatment for inmates or any DOC policies that ban necessary medical treatment for inmates.

Hence, the plaintiffs have satisfied the first two prongs of an equal protection claim. And they have done so as to both their as-applied challenge and their facial challenge. Defendants treat the plaintiffs themselves differently than others similarly situated because of their membership in the class of persons who need hormonal therapy

64

to treat GID, and they treat the entire class differently.  As stated above, the controlling

class for a facial challenge is "the group for whom the law is a restriction, not the group for

whom the law is irrelevant," *Casey*, 505 U.S. at 894.

The court now turns to the third prong, whether the difference in treatment

is rationally related to the legitimate state interest of safety and security.  The rational-

relationship test is a lenient standard.  *Smith*, 457 F.3d at 652.  Under rational basis review,

there is no constitutional violation if "any reasonably conceivable state of facts" would

provide a rational basis for government action.  *FCC v. Beach Commc'ns, Inc.*, 508 U.S.

307, 313 (1993).  The challenging party bears the burden of eliminating any reasonably-

conceivable set of facts that could provide a rational basis for the difference in treatment.

*Smith*, 457 F.3d at 652.  In other words, the plaintiffs must prove the government's

enactment of Act 105 irrational.  *Id.*  And this burden is the same whether the plaintiffs

challenge a statute on its face or as applied.  *Id.*  The rational-basis test is not subject to

courtroom factfinding and may include rational speculation.  *Id.* at 651 (citing *Beach*

*Commc'ns*, 508 U.S. at 315).  The government may defend on any ground, not just the one

articulated at the time of decision.  *Id.* at 652.

Prison safety and security are legitimate penological interests.  *See Overton*

*v. Bazzetta*, 539 U.S. 126, 133 (2003) (describing "internal security" as "perhaps the most

legitimate of penological goals").  The correctional environment can be dangerous, and one

major area of security concern is sexual activity, especially sexual activity among inmates,

which has a history of being extremely dangerous and volatile.

65

However, no reasonably conceivable state of facts provides a rational tie between Act 105 and prison safety and security. Atherton testified that he does not think feminizing inmates is consistent with the mission of the DOC because "it raises the level of risk in general populations that manage inmates who have been feminized in the male environment." (Trial Tr. vol. 3, 422, Oct. 24, 2007.) However, he also testified that the policy of the Colorado Department of Corrections, where he has worked for many years, allows prisoners with GID to have hormone therapy, and he believes that the policy is reasonable. According to Atherton, the policy has a good history and security staff are able to implement it well.

Furthermore, at his deposition, Atherton was asked whether preventing inmates with GID from getting hormones was a way to prevent sexual assaults from happening in the future. He responded:

> That question is an incredible stretch between hormonal therapy and preventing sexual assaults. As I explained in an answer previously, hormonal therapy may or may not be something – have something to do with physical appearance which are one of many ingredients that may contribute to something that supports sexual attraction from one inmate to another which may or may not arise in the form of an assault.

(*Id.* at 426-27.) Although plaintiff Davison was sexually assaulted, there is nothing in the record to indicate Davison would not been assaulted in the absence of hormone therapy. Also, it is undisputed that inmates can look effeminate without hormone therapy. Furthermore, nothing in the record to support a finding that withdrawing hormone therapy from the plaintiffs will decrease the risk that they will become victims of sexual assault. Thus, a connection between the hormone therapy barred by Act 105 and sexual assaults

is not reasonable—instead, defendants' own expert said connecting them was "an incredible stretch."

Defendants' argument that the "evidence supports the obvious" is not sufficient to show that Act 105 is rationally related to prison security. For one thing, DOC policy, Executive Directive 68, allowed for hormone therapy for GID inmates prior to the enactment of Act 105. Also, defendants' security expert was not particularly helpful for the defendants, as described above.

Plaintiffs have satisfied the three elements of an equal protection violation both to the extent that Act 105 applies to them and regarding their facial challenge.

### 3. Relief

Plaintiffs seek a permanent injunction barring enforcement of Act 105 against them and other inmates. A party seeking a permanent injunction "must demonstrate (1) it has succeeded on the merits; (2) no adequate remedy at law exists; (3) the moving party will suffer irreparable harm without injunctive relief; (4) the irreparable harm suffered without injunctive relief outweighs the irreparable harm the nonprevailing party will suffer if the injunction is granted; and (5) the injunction will not harm the public interest." *Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1081 (7th Cir. 1998) (citations omitted). The Prison Litigation Reform Act provides that a court "shall not approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). Given the court's finding that Act 105 is unconstitutional, as applied to these

plaintiffs and on its face, the plaintiffs are entitled to relief. Specific language of the injunction will be discussed at the upcoming status conference.

### 4. Further Conclusions of Law

Further conclusions of law were addressed in this court's order of March 31, 2010, and are incorporated herein.

Dated at Milwaukee, Wisconsin, this 13th day of May, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE